## JUDITH WROBLEWSKI *v.* LEXINGTON GARDENS, INC., ET AL.

SPEZIALE, C. J., PETERS, HEALEY, PARSKEY and ARMENTANO, Js.

 

Argued May 6—decision released August 10, 1982

*Martha Stone,* with whom, on the brief, were *Shelley Geballe* and *Donna Morris,* for the appellant (plaintiff).

*Richard W. Rutherford,* with whom was *Gregory B. Nokes,* for the appellees (defendants).

*Barbara C. Deinhardt* submitted a brief as amicus curiae on behalf of the Coalition of Labor Union Women.

PETERS, J. The principal issue in this case is whether an employer violates state fair employment statutes when its employment application includes a medical history form asking certain questions of women only. The plaintiff, who declined to

complete such a form, was subsequently denied employment and filed a complaint charging sex discrimination with Connecticut's commission on human rights and opportunities. On this appeal the plaintiff challenges the trial court's decision that the commission's hearing examiner correctly found no evidence of sex discrimination but incorrectly found jurisdiction over two parties to the complaint.

The factual history of this case began in 1974, when the plaintiff, Judith Gail Wroblewski, applied for a position with Lexington Gardens, Inc., a new plant store scheduled to open at the end of the year in Glastonbury. After interviews with Robert White, at that time assistant to the president of Lexington Gardens, and Craig Cavanaugh, manager of the Glastonbury store, the plaintiff filled out a bonding application, a tax form, an employee status sheet, and the disputed medical history form. The plaintiff chose not to complete the section of that form marked "Women,"[1] although her private physician who performed the preemployment physical examination wrote "healthy female" in the section marked "physician's summary." Shortly after the plaintiff submitted her medical form, it was returned to her on November 4 by a company nurse

---

[1] The section of the medical form designated "Women" reads as follows: "Have you had any of the following? (Place a circle around any 'yes' answers if the condition has been present during the past 2 years)

|  | Yes | No |
|---|---|---|
| Menstrual problems |  |  |
| Disorder of ovaries or uterus |  |  |
| Number of pregnancies: |  |  |
| Interval between periods: |  |  |
| Duration of periods: |  |  |
| Date of last period: |  |  |
| Date of last 'Pap' smear if any:" |  |  |

The plaintiff answered only the last of the seven questions.

with a cover letter[2] indicating that the omitted questions were "a necessary part of the exam, and must be completed." On November 5, 1974, the plaintiff filed her complaint with the commission charging Pepperidge Farm, Inc., the corporation from whose headquarters the form was returned, with sex discrimination in violation of General Statutes § 31-126 (a). Three days later, a commission investigator met with James Morgan, the director of personnel for Pepperidge Farm, to discuss the plaintiff's complaint. After their meeting, Morgan suggested to officials of Lexington Gardens that they check the plaintiff's references. On December 3 she received a letter from the president of Lexington Gardens refusing her employment without explanation. The plaintiff subsequently amended her complaint to include two additional parties, Campbell Soup Company and Lexington Gardens, and a claim of retaliatory refusal to hire in violation of General Statutes § 31-126 (d).

After evidentiary hearings in March, April, and May of 1976, a commission hearing examiner concluded that the amended complaint properly cited Campbell Soup and Lexington Gardens as parties.[3] On the claims of sex discrimination, the examiner found that the medical history form did not unlawfully discriminate against women and that the commission had failed to prove a discriminatory or

---

[2] The complete letter from Lucille M. Dahm, R.N., of Pepperidge Farm, read as follows: "Please complete exam form where checked in red. This is a necessary part of the exam, and must be completed. Please return to me as soon as possible in the enclosed self-addressed stamped envelope. Thank you."

[3] The hearing examiner initially dismissed the plaintiff's complaint against all three defendants on procedural grounds. The plaintiff appealed that decision to the Court of Common Pleas, which reversed and remanded for further consideration. The examiner's decision on remand is described below.

retaliatory refusal to hire. When, in response to a motion for reconsideration, the examiner denied any further hearing or relief, the plaintiff appealed his decision to the Superior Court.[4] See General Statutes § 4-183. The trial court reversed the hearing examiner's finding of jurisdiction over Campbell Soup and Lexington Gardens but affirmed his findings on the discrimination claims. On appeal to this court, the plaintiff claims that the trial court erred in dismissing the case against two parties; in failing to find a discriminatory refusal to hire in violation of General Statutes § 31-126 (a); and in failing to find a retaliatory refusal to hire in violation of General Statutes § 31-126 (d). The plaintiff does not, however, challenge any subsidiary fact-finding by the hearing examiner. Because the identity of the proper parties to this appeal is an essential predicate to a review of the plaintiff's substantive claims of discrimination, we will first address the jurisdictional issue.

## I

The plaintiff's original complaint, filed on November 5, 1974, charged Pepperidge Farm with a November 4 violation of General Statutes § 31-126 (a), which prohibits discrimination on the basis of sex in employment practices. Thereafter, following her receipt on December 3 of a letter from the president of Lexington Gardens denying her employment and the failure of the commission's subsequent conciliation efforts, the plaintiff on September 24, 1975, filed her second, amended, complaint, this time naming Campbell Soup, Lexington

---

[4] Motions for reconsideration were filed by the commission and by the plaintiff's own counsel. After reviewing the transcripts of the evidentiary hearing, the examiner reaffirmed his previous decision, and the plaintiff filed her appeal in Superior Court.

Gardens, and Pepperidge Farm and charging as well a violation of General Statutes § 31-126 (d), which prohibits employer retaliation.

In its memorandum of decision the trial court accepted the retaliation claim as a valid amendment but concluded that the September 24 addition of Campbell Soup and Lexington Gardens to the plaintiff's complaint, more than ninety days after the alleged act of discrimination, "represented an entirely new complaint which did not relate back to the filing of the original complaint against Pepperidge Farms [sic] on November 4 [sic], 1974."[5] The court thus reversed the hearing examiner, who had determined that the similarities between the two complaints and the relationships among the parties rendered the second complaint a permissible amendment. After reviewing the record before us, we hold that the trial court erred in rejecting the examiner's finding of jurisdiction.

At the hearing held before the commission's examiner, witnesses from the three corporations named by the plaintiff testified at length about the organizational ties of their companies. Their uncontradicted testimony revealed the following facts: Pepperidge Farm and Lexington Gardens are both subsidiaries of Campbell Soup, which provides

---

[5] The trial court incorrectly applied a ninety day deadline for filing complaints of discrimination. General Statutes § 31-127, the statute governing procedure for complaints to the commission, was amended on April 22, 1974 to increase the filing period from ninety to one hundred and eighty days: "Any complaint filed pursuant to this section must be so filed within one hundred and eighty days after the alleged act of discrimination." Public Acts 1974, No. 74-54, effective October 1, 1974. Since the plaintiff's initial complaint was not filed until November 5, 1974, the amended statute applies. In any event, because the plaintiff's second complaint was filed more than one hundred and eighty days after the alleged act of discrimination, the trial court's error in this respect is harmless.

medical, legal and personnel management services to them in return for an annual fee. Erwin Schneider, the president of Lexington Gardens, is also a vice president of Pepperidge Farm and receives his salary from the latter company. The medical form used by Lexington Gardens for its job applicants was developed by the medical director of Campbell Soup, Dr. Roland F. Wear, Jr.; it carries the heading "Pepperidge Farm" and is returned directly to Wear's office at Campbell headquarters. All medical records for Lexington Gardens are controlled by the Pepperidge Farm nurse who rejected the plaintiff's form as incomplete.

The defendants' handling of the plaintiff's job application and complaint further demonstrates the network of ties among these companies. Robert White, who initially interviewed the plaintiff for a position with Lexington Gardens, at that time had an office at Pepperidge Farm headquarters in Norwalk. The commission investigator first discussed the plaintiff's complaint with James Morgan, director of personnel for Pepperidge Farm, and it was Morgan who then suggested to Craig Cavanaugh of Lexington Gardens that he check the plaintiff's references. When Cavanaugh had difficulty in obtaining the necessary information, Morgan checked one reference himself. Morgan further testified that he promptly discussed the plaintiff's complaint with Wear and consulted the legal department of Campbell Soup. When Morgan wrote to the commission investigator concerning the complaint, he used a Lexington Gardens letterhead and signed himself "Director of Personnel, Lexington Gardens, Inc."

We include this detailed account of corporate interconnections because it amply supports the

examiner's finding that both Lexington Gardens and Campbell Soup had full knowledge of the proceedings from the filing of the plaintiff's initial complaint. The three corporations named by the plaintiff functioned, with regard to the plaintiff's employment, as one intertwined enterprise, repeatedly acting for one another without formal designations of agency. The record clearly indicates that all three corporations had prompt notice of the plaintiff's complaint and consulted freely about their response to her charges. Under these circumstances, the examiner correctly concluded that the second complaint was properly to be treated as an amendment rather than a new charge subject to the one hundred and eighty day statutory deadline. General Statutes § 31-127 clearly provides that "[t]he tribunal conducting any hearing may permit reasonable amendment to any complaint or answer . . . ." See *West Hartford* v. *Commission on Human Rights & Opportunities,* 176 Conn. 291, 297, 407 A.2d 964 (1978); *Groton* v. *Commission on Human Rights & Opportunities,* 169 Conn. 89, 100, 362 A.2d 1359 (1975); *Veeder-Root Co.* v. *Commission on Human Rights & Opportunities,* 165 Conn. 318, 328, 334 A.2d 443 (1973). The formal addition, over five months before the hearing, of two parties already fully informed of the plaintiff's charges and intimately involved in the employment procedure under scrutiny must be viewed as a reasonable amendment within the hearing tribunal's statutory discretion. In deciding otherwise the trial court erred.

## II

The plaintiff's principal claim of error on this appeal is the trial court's failure to find that the defendants' medical form with a section designated

"Women" was a discriminatory employment practice under General Statutes § 31-126 (a).[6] In its memorandum of decision the trial court accepted as adequately supported by the record the hearing examiner's conclusion that since "gender was not the motivation for asking the questions . . . the disparate treatment accorded males and females in this circumstance was not discriminatory." The plaintiff challenges this conclusion on the ground that both the hearing examiner and the trial court applied an incorrect legal standard to the factual record before them.

The plaintiff's amended complaint, which framed the issues to be decided by the hearing tribunal,

[6] Since the plaintiff's complaint was filed, the legislature has passed a statute limiting an employer's right to require information from an employee concerning his or her reproductive system.

" PUBLIC ACT NO. 81-382

AN ACT CONCERNING THE PROTECTION OF WORKERS FROM REPRODUCTIVE HAZARDS AND OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION.

Section 1. Section 46a-51 of the general statutes is amended by adding subsection (17) as follows:

(NEW) (17) "Discrimination on the basis of sex" includes but is not limited to discrimination related to pregnancy, child bearing capacity, sterilization, fertility or related medical conditions.

Sec. 2. Subsection (a) of section 46a-60 of the general statutes is amended by adding subdivisions (9) and (10) as follows:

(NEW) (9) For an employer, by himself or his agent, for an employment agency, by itself or its agent, or for any labor organization, by itself or its agent, to request or require information from an employee, person seeking employment or member relating to the individual's child bearing age or plans, pregnancy, function of the individual's reproductive system, use of birth control methods, or the individual's familial responsibilities, unless such information is directly related to a bona fide occupational qualification or need, provided an employer, through a physician may request from an employee any such information which is directly related to workplace exposure to substances which may cause birth defects or constitute a hazard to an individual's reproductive system or to a fetus if the employer first informs the employee of the hazards involved in exposure to such substances. . . ." This statute is of course inapplicable to the plaintiff's case.

charged the three defendants with discrimination on the basis of sex in hiring and in the terms or conditions of employment under General Statutes § 31-126 (a).[7] *West Hartford* v. *Commission on Human Rights & Opportunities,* supra; *Groton* v. *Commission on Human Rights & Opportunities,* supra. That provision offers an employer only one justification for a discriminatory practice, "a bona fide occupational qualification or need." In interpreting and applying this statute we are properly guided by the case law surrounding federal fair employment legislation; 42 U.S.C. § 2000e, et seq.; since this court has previously confirmed our legislature's intention "to make the Connecticut statute coextensive with the federal." *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities,* 170 Conn. 327, 331, 365 A.2d 1210 (1976).

## A

A party claiming a violation of § 31-126 (a) must at the outset establish a prima facie case of discrimination. See *McDonnell Douglas Corporation* v. *Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Board of Education* v. *Commission on Human Rights & Opportunities,* 176 Conn. 533, 537, 409 A.2d 1013 (1979). Only then does the burden shift to the employer "to show a legitimate nondiscriminatory reason for the employer's conduct." *Board of Education* v. *Commission on*

---

[7] General Statutes § 31-126 (a) (now General Statutes § 46a-60 [a] [1]) provides as follows: "Sec. 31-126. UNFAIR EMPLOYMENT PRACTICES. It shall be an unfair employment practice (a) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, because of the race, color, religious creed, age, sex, national origin, ancestry or physical disability, including, but not limited to, blindness of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against him in compensation or in terms, conditions or privileges of employment."

*Human Rights & Opportunities,* supra. The threshold issue before us, then, is whether the plaintiff has successfully met her burden of establishing a prima facie case of sex discrimination.

It is undisputed that the defendants' employment application procedure treated women differently from men.[8] The applicable medical form asked only women to answer seven distinct questions concerning their urogenital health; the form contained no questions about the male urogenital system. Although the defendants do not deny that their form facially distinguished between men and women, they contend that the acknowledged difference is nondiscriminatory because comparable information was subsequently elicited from men by their examining physicians. They maintain, furthermore, that the difference in their treatment of men and women was motivated by their concern that women traditionally resist intrusive pelvic examinations and that their divergent practice was thus designed to accommodate perceived female sensibilities. The question before us is whether these various proffered justifications conform to the standards set by our unfair employment practices statutes.

We begin by noting that the benchmark against which allegedly discriminatory employment practices are to be tested is not the motive, not even the

---

[8] At oral argument the defendants' counsel conceded that the form treated women differently but argued that it was not discriminatory in context. In his August 10, 1978 memorandum of decision upon remand, the hearing examiner observed of the form, "[c]ertainly, a review of the Exhibit in question indicates that women are treated differently in that they are required to answer seven questions related to the female organs. There is, on this form, no comparable section referring to males. In addition, the form is devoid of any questions relating to the male urogenital system." He repeated this observation in his December 11, 1978 memorandum of decision regarding motions for reconsideration.

benign motive, of the discriminatory employer. We have held that "good faith is not exculpatory under § 31-126 (a), since the target of fair employment legislation is the effect, and not the purpose, of discrimination." *Board of Education* v. *Commission on Human Rights & Opportunities,* supra, 539. It is the procedure itself, and not the motive behind it, that we must examine.

The defendants' application procedure discriminated in practice against women because only women were absolutely required to answer questions about their reproductive systems. That these questions were mandatory is evidenced by the defendants' response to the plaintiff's submission of an incomplete form. Despite her physician's explicit finding, on the form itself, that she was a "healthy female,"[9] the incomplete form was returned to her and the hiring process halted. In contrast, men seeking employment with the defendants were asked no question on the medical form about their urogenital health history. Instead, they were generally required to submit to a physical examination, whose conduct was left in some measure to the discretion of each examining physician. The record indicates that not all male employees in fact received such examinations and not all examinations in fact included procedures to ascertain male urogenital health.[10] This evidence clearly demon-

[9] The plaintiff's physician did not himself perform a pelvic examination. At the hearing he testified that he relied on the fact that the plaintiff had been examined by her gynecologist, a physician known to him, three months earlier. The defendants never in any fashion challenged the finding of the plaintiff's physician.

[10] At the hearing, Wear testified that some male applicants had apparently been hired without undergoing a physical examination. He further testified that although he attempted to inform male applicants' physicians of his requirements concerning urogenital examinations, he was not always able to issue specific instructions.

strates a difference in hiring procedures sufficient to establish a prima facie case of discrimination. See *Phillips* v. *Martin Marietta Corporation,* 400 U.S. 542, 544, 91 S. Ct. 496, 27 L. Ed. 2d 613 (1971).

### B

Once the plaintiff has met her burden of establishing a prima facie case of discrimination, the defendant employers must meet their burden by proving the existence of a bona fide occupational qualification, or bfoq, to justify their divergent treatment of male and female applicants.[11] This burden is a heavy one, since it is clear that "the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard* v. *Rawlinson,* 433 U.S. 321, 334, 97 S. Ct. 2720, 53 L. Ed. 2d 786 (1977); *In re Consolidated Pretrial Proceedings,* 582 F.2d 1142, 1145 (7th Cir. 1978); *Rosenfeld* v. *Southern Pacific Co.,* 444 F.2d 1219, 1224 (9th Cir. 1971); *Evening Sentinel* v. *National Organization for Women,* 168 Conn. 26, 38, 357 A.2d 498 (1975); Schlei & Grossman, Employment Discrimination Law (1976), p. 279; 1 Larson, Employment Discrimination (1981) § 14.00; see generally Sirota, "Sex Discrimination: Title VII and the Bona Fide Occupational Qualification," 55 Tex. L. Rev. 1025

---

[11] The so-called "business necessity" exception to the statutory prohibition against discrimination, articulated in *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 431, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971), applies only when a facially neutral employment practice has a discriminatory effect. *Connecticut Institute for the Blind* v. *Commission on Human Rights & Opportunities,* 176 Conn. 88, 93, 405 A.2d 618 (1978); see *Dothard* v. *Rawlinson,* 433 U.S. 321, 332, 97 S. Ct. 2720, 53 L. Ed. 2d 786 (1977); *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 425, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975); *Harper* v. *Thiokol Chemical Corporation,* 619 F.2d 489, 492 (5th Cir. 1980); cf. *Phillips* v. *Martin Marietta Corporation,* 400 U.S. 542, 544, 91 S. Ct. 496, 27 L. Ed. 2d 613 (1971).

(1977). The defendants must demonstrate that under the procedure they employ "no member of the class excluded is physically capable of performing the tasks required by the job." *Evening Sentinel* v. *National Organization for Women*, supra, 36; see *Connecticut Institute for the Blind* v. *Commission on Human Rights & Opportunities*, 176 Conn. 88, 95, 405 A.2d 618 (1978). Thus, on the record before us, the defendants must prove that no female applicant who fails to complete their medical form has provided sufficient assurance of good health to warrant employment at Lexington Gardens.

The evidence offered by the defendants in support of their application procedure took two forms. First, the defendants presented expert medical testimony linking the questions for women to the detection of specific health problems which could incapacitate an employee. Second, they presented evidence that some insecticides potentially dangerous to pregnant women might be used in the Lexington Gardens plant store. The record before us is barren of evidence that such insecticides were actually in use at the Glastonbury store.[12] Therefore,

---

[12] When Robert White began to testify concerning the use by Lexington Gardens of insecticides potentially dangerous to pregnant women, the defendants' counsel agreed to submit to the examiner a list of such products actually used at the Glastonbury store. No such list is included in the record before us, and in effect that defense was abandoned.

In his memorandum of decision regarding motions for reconsideration, the hearing examiner found that question two on the medical form, "disorder of ovaries or uterus," was relevant to "whether that person should be exposed to the insecticides which are utilized at a plant store." The transcript page cited by the examiner in support of this conclusion contains the testimony of Wear that "I certainly would not want an individual who is pregnant exposed to certain things like pesticides, like in gardens at some of our locations, or exposed to lead at a can plant." Since the record contains no evidence that such insecticides were in fact used at the Glastonbury store, any conclusion relying on absent evidence must fall.

we will confine our analysis to the sufficiency of evidence of the first type to support the conclusion of the hearing examiner, affirmed by the trial court, "that the questions asked on the form were motivated by considerations of health" rather than considerations of gender. We hold that under the controlling law of sex discrimination, such evidence is an insufficient justification for the employers' discriminatory practice.

We begin by recalling our earlier point that an employer's motivation in distinguishing one sex from another is not relevant to the determination of a bfoq. *Board of Education* v. *Commission on Human Rights & Opportunities,* supra, 539; see *Laffey* v. *Northwest Airlines, Inc.,* 567 F.2d 429, 454 (D.C. Cir. 1976). Instead, the defendants must show that the claimed occupational qualification, reproductive good health, requires different methods of examination for men and women. We need not decide today to what extent reproductive good health is itself an acceptable bfoq under § 31-126 (a) or whether, as the plaintiff argues, these questions are an improper invasion of privacy, because we find that the record fails to demonstrate any valid basis for the defendants' chosen method of screening female applicants' health.

The only basis proffered by the defendants for screening the urogenital health of female applicants by written questions and male applicants by physical examination is the testimony of Wear, Campbell's medical director, that "women don't like being examined, having a pelvic examination forced on them." Such a generalization about the preferences of women as a group cannot be invoked to deny the right of any individual woman to be treated in the same manner as male applicants. As the

United States Supreme Court has written of federal fair employment legislation, "[t]he statute's focus on the individual is unambiguous. It precludes treatment of individuals as simply components of a racial, religious, sexual, or national class. . . . Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply." *Los Angeles Department of Water & Power* v. *Manhart*, 435 U.S. 702, 708, 98 S. Ct. 1370, 55 L. Ed. 2d 657 (1978).

The harm in such generalizations, however benign in intent, derives from "[t]he very act of classifying individuals by means of criteria irrelevant to the ultimate end sought to be accomplished. . . ." *Evening Sentinel* v. *National Organization for Women,* supra, 35; see *Connecticut Institute for the Blind* v. *Commission on Human Rights & Opportunities,* supra, 96. The defendants' application procedure precluded women from choosing to demonstrate their good health by means of a physical examination. When the plaintiff's medical form marked "healthy female" by her physician was returned to her, she was denied an opportunity to qualify for employment in the same manner as male applicants. Yet "[i]t is now well recognized that employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females." *Los Angeles Department of Water & Power* v. *Manhart,* supra, 707; see *Frontiero* v. *Richardson,* 411 U.S. 677, 684–85, 93 S. Ct. 1764, 36 L. Ed. 2d 583 (1973); *Carroll* v. *Talman Federal Savings & Loan Assn. of Chicago,* 604 F.2d 1028, 1030–31 (7th Cir. 1979); *Rosenfeld* v. *Southern Pacific Co.,* supra, 1224; *Sprogis* v. *United Airlines, Inc.,* 444 F.2d 1194, 1198 (7th Cir. 1971).

An employer concerned about the health of prospective employees may establish reasonable procedures for screening the health of all job applicants, but he may not assume that women prefer one method of examination and men another and treat all applicants accordingly. See *Allen* v. *Lovejoy,* 553 F.2d 522, 524 (6th Cir. 1977). After the plaintiff's physician certified her as a "healthy female," the defendants raised no further medical grounds to justify their insistence on her completion of their form. See *Harper* v. *Thiokol Chemical Corporation,* 619 F.2d 489, 492 (5th Cir. 1980). We therefore hold that the trial court erred in finding that completion of the defendants' medical form was sufficiently job-related to render it nondiscriminatory and in failing to issue the requisite cease and desist order provided by General Statutes § 31-127 (now General Statutes § 46a-82).

## C

This holding does not, however, end our inquiry. Under *McDonnell Douglas Corporation* v. *Green,* supra, the defendants may offer evidence of a legitimate nondiscriminatory business reason for their refusal to hire.[13] See 2 Larson, Employment Discrimination, supra, § 50.32. The United States Supreme Court has recently clarified the evidentiary burdens imposed by a claim of employer discrimination under federal law. "In *McDonnell Douglas Corp.* v. *Green,* 411 U.S. 792 [93 S. Ct. 1817, 36 L. Ed. 2d 668] (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory

---

[13] Although the record reveals some confusion over the precise position for which the plaintiff had applied, hard goods manager or sales clerk, we need not resolve that question before considering the plaintiff's discrimination claim.

treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Id., at 802. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Id., at 804." (Footnote omitted.) *Texas Department of Community Affairs* v. *Burdine,* 450 U.S. 248, 252–53, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Under *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities,* supra, the *Burdine* test is applicable to the plaintiff's claim of a discriminatory refusal to hire.

*Burdine* permits an employer to rebut a plaintiff's prima facie case by presenting evidence of nondiscriminatory reasons for its refusal to hire sufficient to raise "a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Department of Community Affairs* v. *Burdine,* supra, 254–55. The employer need not, however, "persuade the court that it was actually motivated by the proffered reasons." Id., 254. The hearing examiner and the trial court found that the defendants had met their burden, but that the plaintiff did not succeed in demonstrating that the proffered reasons were not in fact "the true reason for the employment decision." Id., 256.

An examination of the record reveals some basis for these findings on the second two stages of the

*Burdine* test. The defendants' rejoinder to the plaintiff's prima facie case consisted of testimony that her references were unsatisfactory. Robert White and James Morgan testified that the plaintiff's prior employers characterized her as "too independent," "hard to handle," and "temperamental"; Schneider then testified that he made the final decision not to hire the plaintiff after reviewing these references with White and Morgan. This evidence is sufficient to raise a genuine issue of fact concerning the defendants' reasons for rejecting the plaintiff; it thus satisfies the *Burdine* requirement.

The plaintiff attempted to meet her burden of proving the defendants' reasons pretextual by offering evidence that unusual screening procedures were adopted to defeat her application and that her qualifications were in fact superior to those of the employees subsequently hired by Lexington Gardens.[14] The crucial evidentiary issue, however, was the substance of the oral reference given by Donald French, the plaintiff's supervisor at G. Fox & Co., to James Morgan. French testified that he had characterized the plaintiff as individualistic rather than temperamental and that his intent was to give her a good reference. His evidence conflicted with that of Morgan, who testified that his notes of the conversation with French indicated that the term "temperamental" was used of the plaintiff and that the tenor of the reference was unfavorable. After receiving French's reference, the defendants made inquiry of the plaintiff's other former employer and received a concededly marginal evaluation. It is

---

[14] The record indicates that references of subsequent applicants for positions at Lexington Gardens were also checked by the defendants.

undisputed that all the plaintiff's references were solicited after the defendants had been informed of the plaintiff's complaint.

Under ordinary circumstances an apparently factual issue concerning the nature of the plaintiff's references would properly be left to the discretion of the hearing examiner as trier of fact, and "[t]he findings of the hearing tribunal as to the facts, if supported by substantial and competent evidence . . . " would be conclusive. General Statutes § 31-128 (b) (now General Statutes § 46a-95 [g]). Under the unusual circumstances of this case, however, consideration of the refusal to hire was inseparable from the examiner's incorrect conclusion, affirmed by the trial court, that the plaintiff was unjustified in her discrimination claim. Where the trier of fact is asked to determine whether a party was characterized by her supervisor as "individualistic" or "temperamental," two terms that clearly exist on a continuum, his rejection of her discrimination claim may well color his evaluation of evidence concerning her character and conduct in other areas. We find this to be one of those rare cases in which "particular findings are so enmeshed with the legal standard to be applied that even facially proper findings might require further inquiry." *Connecticut Institute for the Blind* v. *Commission on Human Rights & Opportunities,* supra, 96. The trial court is the appropriate body to consider in the first instance whether the hearing examiner's incorrect conclusion that the defendants' medical form was nondiscriminatory fatally tainted his subsequent conclusion that their refusal to hire the plaintiff was similarly nondiscriminatory.

### III

The plaintiff's third claim of error is the trial court's failure to find a retaliatory refusal to hire in violation of General Statutes § 31-126 (d).[15] In its memorandum of decision, the court accepted the hearing examiner's conclusion that the defendants had established adequate nondiscriminatory reasons for their refusal to hire the plaintiff after the filing of her complaint with the commission. The plaintiff argues that these reasons were merely a pretext to conceal the defendants' retaliatory conduct.

The elements of this claim, and the test applicable to it, are identical to those of the plaintiff's claim of a discriminatory refusal to hire discussed above: the defendants may rebut the plaintiff's prima facie case by offering evidence of a nonretaliatory basis for their refusal to hire, and the plaintiff must then prove that basis pretextual. *Texas Department of Community Affairs* v. *Burdine,* supra, 252–53. The hearing examiner found that the plaintiff had met her initial burden of showing retaliation by evidence that the defendants had refused her employment on December 3, 1974, less than a month after she filed her initial complaint with the commission. The same evidence of inadequate references offered by the defendants in response to the plaintiff's claim of a discriminatory refusal to hire was accepted by the examiner as rebuttal of the retaliation claim.

---

[15] General Statutes § 31-126 (d) (now General Statutes § 46a-60 [a] [4]) provides as follows: "Sec. 31-126. UNFAIR EMPLOYMENT PRACTICES. It shall be an unfair employment practice . . . (d) for any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any unfair employment practice or because he has filed a complaint or testified or assisted in any proceeding under section 31-127."

Here, however, there is not the same question of taint because the hearing examiner accepted as proven the plaintiff's prima facie case. We therefore have no reason to require reexamination of his conclusion "that the Commission failed to sustain its burden" of proving the proffered basis pretextual. We must reject the plaintiff's claim of retaliation.

There is error as to jurisdiction and in the failure to issue a cease and desist order requiring the defendants to cease use of their discriminatory health form. The judgment is set aside and the case is remanded for further proceedings in accordance with this opinion.

In this opinion SPEZIALE, C. J., HEALEY and ARMENTANO, Js., concurred.

PARSKEY, J. (concurring in part and dissenting in part). I agree with the court's opinion except for Part II, C.

It is a discriminatory practice for an employer, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ a person because of sex. General Statutes § 46a-60. The hearing on a charge of a claimed discriminatory employment practice involves two issues, namely, (1) the existence of a discriminatory employment practice and (2) the causal relationship between that practice and the complainant's rejection. In addressing the first question, the trial court concluded that though disparate treatment of women was shown by the use of the employment application form, there was ample support in the record for the hearing examiner's conclusion that the sep-

arate questions asked of women were motivated by reasons of health and therefore the use of the particular application form did not constitute a discriminatory practice. I agree with the majority that the use of the application form in question constitutes a discriminatory practice as a matter of law and thus requires the issuance of a cease and desist order.

Once a discriminatory practice has been found the only remaining issue involves the appropriate remedy. General Statutes § 46a-86 (a) provides in pertinent part that "[i]f, upon all the evidence . . . the hearing officer finds that a respondent has engaged in any discriminatory practice . . . [he] shall issue . . . and cause to be served on the respondent an order requiring the respondent to cease and desist from the discriminatory practice . . . ." The majority recognizes this in its direction, ante at p. 60, that such order shall issue. The statute also authorizes the hearing officer to require the respondent "to take such affirmative action as in the judgment of the hearing officer will effectuate the purpose of this chapter." Under subsection (b) of § 46a-86 the affirmative action referred to in subsection (a) includes hiring of the employee, with or without back pay. If there is a causal connection between the discriminatory practice and the refusal to hire then affirmative relief would be presumptively indicated. To paraphrase the United States Supreme Court in Title VII cases, the Discriminatory Employment Practices Act deals with legal injuries of an economic character occasioned by sex discrimination. Where prohibited discrimination is involved, the hearing officer has not merely the power but the duty to render a decree which will, so far as possible, eliminate the

discriminatory effects of the past as well as bar like discrimination in the future. *Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 418, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975). Given a finding of a refusal to hire resulting from a discriminatory practice, the hiring of the person discriminated against should be denied only for reasons which, if applied generally, would not frustrate the central statutory purpose of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination. Id.

The reason that affirmative relief may be warranted in this case is that the evidence is sufficient to establish a causal connection between the discriminatory practice and the rejection of the plaintiff's application. When the plaintiff refused to answer those portions of the application form which she regarded as intrusive, her application was held up. This was before the plaintiff filed with the commission on human rights and opportunities her complaint alleging retaliatory action. Later, when she was rejected by the employer, no reason was assigned for such rejection. It would not be unreasonable for a trier to infer from this evidence that her rejection was causally related to the defendants' discriminatory practice. The practice found wanting here is no different in substance from the discriminatory qualification test condemned in *Griggs* v. *Duke Power Co.,* 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971), which the United States Supreme Court recognized as requiring analysis different from that required for a neutral act which potentially has a discriminatory impact. *McDonnell Douglas Corporation* v. *Green,* 411 U.S. 792, 806, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

The presumption in favor of affirmative relief is a strong one that seldom can be overcome. *Los Angeles Department of Water & Power* v. *Manhart,* 435 U.S. 702, 719, 98 S. Ct. 1370, 55 L. Ed. 2d 657 (1978). Although affirmative relief is not an automatic remedy for the correction of a discriminatory practice, the denial of such relief can never be justified merely on the basis of the "good faith" of the employer. *Albemarle Paper Co.* v. *Moody,* supra, 422. "If [affirmative relief] were awardable only upon a showing of bad faith, the remedy would become a punishment for moral turpitude, rather than a compensation for workers' injuries." Id. In any event, the remand to the trial court should be with direction to remand the case to a hearing officer for the limited purpose of determining the appropriate remedy. At such hearing, the burden should be on the defendants to show that affirmative relief would not be appropriate because the plaintiff does not possess the requisite qualifications for the position. See *Teamsters* v. *United States,* 431 U.S. 324, 360, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977); *Franks* v. *Bowman Transportation Co.,* 424 U.S. 747, 763, 96 S. Ct. 1251, 47 L. Ed. 2d 444 (1976).

If an employer has a neutral employment policy or practice, a complainant charging either disparate treatment or disparate impact bears the ultimate burden of persuading the trier that he has been the victim of discriminatory action in the face of the employer's articulation of a non-discriminatory ground for the suspected action. If, on the other hand, an employer has engaged in a practice which is facially discriminatory or in a pattern of discrimination in the past, then in order to effectuate the governmental policy of eradicating discriminatory treatment or practices, it is appropriate in the

individual case of claimed discrimination for the employer to bear the ultimate burden of showing that its rejection of the individual complainant was due to non-discriminatory causes. Cf. *Phillips Co. v. Walling,* 324 U.S. 490, 493, 65 S. Ct. 807, 89 L. Ed. 1095 (1945); note, "Developments in the Law— Employment Discrimination and Title VII of the Civil Rights Act of 1964," 84 Harv. L. Rev. 1109, 1169 n.22 (1971). Sensitivity to the fundamental policy considerations underlying the Discriminatory Employment Practices Act requires that the victim of such practices be treated as more than merely a sacrificial lamb for future benefit of others similarly situated.