CHESTNUT REALTY, INC. *v.* COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES ET AL.
(12699)

PETERS, C. J., SHEA, CALLAHAN, MENT and A. ARONSON, Js.

Argued June 5—decision released September 2, 1986

*Thomas P. Clifford III,* assistant attorney general, with whom were *Emily M. Resnik,* law student intern, and, on the brief, *Joseph I. Lieberman,* attorney general, and *Robert W. Garvey,* assistant attorney general, for the appellant (named defendant).

*David R. Schaefer,* with whom was *Hillard N. Einbinder,* for the appellee (plaintiff).

CALLAHAN, J. This is an appeal by the commission on human rights and opportunities (hereinafter CHRO) on behalf of the complainant Kenneth Barboza, from a judgment of the Superior Court, reversing the decision of a CHRO hearing officer. The dispositive issue is the nature of the evidentiary burdens placed on the complainant and respondent in a housing discrimination action. The tribunal found that Chestnut Realty, Inc. (hereinafter Chestnut Realty), had discriminated against Barboza in violation of General Statutes § 53-35 (a)[1] by

---

[1] General Statutes (Rev. to 1977) § 53-35 (a) provides: "Sec. 53-35. DIS-CRIMINATION IN PUBLIC ACCOMMODATIONS, RENTAL HOUSING, COMMERCIAL PROPERTY, SALE OF BUILDING LOTS AND MOBILE HOME PARKS. (a) All persons within the jurisdiction of this state shall be entitled to full and equal accommodations in every place of public accommodation, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons; and any denial of such accommodation by reason of race, creed, color, national origin, ancestry, sex, marital status, age, mental retardation or physical disability, including, but not limited to, blindness or deafness of the applicant therefor shall be a violation of the

refusing to sell him an unimproved building lot located in Woodbridge, because of his race. The CHRO appeals the judgment of the Superior Court claiming that the court erred in: (1) exercising jurisdiction over the appeal; (2) finding that the hearing officer had applied an improper standard for determining whether the complainant had made out a prima facie case; (3) finding that the hearing officer had shifted the burden of proof improperly to the respondent to show a legitimate nondiscriminatory purpose for refusing to sell to the complainant; and (4) measuring the complainant's

provisions of this section. Any discrimination, segregation or separation, on account of race, creed, color, national origin, ancestry, sex, marital status, age, mental retardation or physical disability, including, but not limited to, blindness or deafness shall be a violation of this section. A place of public accommodation, resort or amusement within the meaning of this section means any establishment, which caters or offers its services or facilities or goods to the general public including, but not limited to, public housing projects and all other forms of publicly assisted housing, and further including any housing accommodation, commercial property or building lot, on which it is intended that a housing accommodation or commercial building will be constructed, offered for sale or rent, and mobile home parks as defined in section 21-64, provided the provisions of this section shall not apply (1) to the rental of a housing accommodation in a building which contains housing accommodations for not more than two families living independently of each other, if the owner or members of his family reside in one of such housing accommodations, or (2) to the rental of a room or rooms in a housing accommodation, if such rental is by the occupant of the housing accommodation, or by the owner of the housing accommodation and he or members of his family reside in such housing accommodation. The provisions of this section, with respect to the prohibition of sex discrimination, shall not apply to the rental of sleeping accommodations provided by associations and organizations which rent all such sleeping accommodations on a temporary or permanent basis for the exclusive use of persons of the same sex. The provisions of this section, with respect to the prohibition of discrimination on the basis of marital status, shall not be construed to prohibit the denial of housing accommodations to a man and a woman who are unrelated by blood or who are not married to each other. The provisions of this section, with respect to the prohibition of discrimination on the basis of age, shall not apply to minors, to federal or state aided or municipal housing for elderly persons or to privately owned housing developed and maintained exclusively for persons within specified age groups. . . ."

This statute was recodified and now appears under General Statutes § 46a-64.

damages. We conclude that the trial court erred in finding that the complainant had not made out a prima facie case of discrimination. We find no error on the CHRO'S other claims.

After conducting a formal hearing, the hearing officer found the following facts. Chestnut Realty was a Connecticut corporation wholly owned by Marvin and Norma Schaefer. The corporation was engaged in the business of buying, selling, and developing real estate. Chestnut Realty in September, 1977, was the owner of lot 7 located in the subdivision known as Chestnut Lane Estates in Woodbridge. Marvin Schaefer constructed a house on lot 5 within this same subdivision, and listed it with a real estate agent on April 19, 1972. Prior to January, 1973, the Schaefers had been living in a house on Sunbrook Road in Woodbridge. In January, 1973, when the Schaefers still had not sold the house on lot 5, they sold their home on Sunbrook Road in Woodbridge and moved into the house on lot 5. The house on lot 5 remained on the market until March, 1981. It was the Schaefers' plan to build a smaller house on lot 7 within the subdivision as soon as they found a buyer for their home on lot 5. As of September 11, 1977, the Schaefers had not received an acceptable offer on lot 5.

Shortly before September 11, 1977, Kenneth Arrington, a real estate agent and the brother-in-law of the complainant, Kenneth Barboza, telephoned Schaefer concerning the availability of residential building lots within the Chestnut Lane Estates subdivision. Schaefer said that he had some lots for sale and an appointment was arranged to view the lots on September 11, 1977. On that day, the complainant and his wife were told by Schaefer that both lots 7 and 8 were for sale. During the meeting, the complainant viewed both lots but spent the majority of the time discussing the solar home capabilities of lot 7.

Following the meeting, Schaefer had a discussion with his wife concerning the sale of lot 7 during which Norma Schaefer reiterated her desire to build a home for themselves on the lot. The complainant's agent contacted Schaefer on September 12, 1977, to inform him that the complainant intended to make an offer on lot 7. On the same day two or three couples came to view the house on lot 5; however, no offers to purchase were forthcoming as a result of these visits. On September 13, 1977, the complainant's agent called and spoke with Norma Schaefer. He told her that the complainant had accepted the asking price on lot 7 and that he wished to place a deposit on lot 7. Norma Schaefer replied that the lot was no longer for sale. On September 16, 1977, the complainant, who is black, filed a complaint with CHRO alleging a violation of the Public Accommodations Act, General Statutes (Rev. to 1977) § 53-35 (a) (now General Statutes § 46a-64). The title to lot 7 was subsequently transferred from Chestnut Realty to the Schaefers on June 14, 1979, for $40,000.

On the basis of these and other facts, the hearing officer concluded that the respondent had discriminated against the complainant because of his race in violation of General Statutes (Rev. to 1977) § 53-35 (a). On April 20, 1983, the tribunal ordered the defendant to cease and desist in its violations of § 53-35 (a), to pay the complainant actual and compensatory damages, and to offer for sale a lot within the subdivision known as Chestnut Lane Estates similar to lot 7 at the price for which lot 7 was offered in September, 1977.

I

Before we address the CHRO's claim concerning the evidentiary burdens in a housing discrimination case, we must dispose of its claim that the Superior Court lacked jurisdiction over the appeal from the CHRO's decision. First, the CHRO argues that Chestnut Realty

improperly commenced its appeal by using a Form 103.1 (JD-CV-1) writ of summons, which is prohibited by Practice Book § 49.[2] Practice Book § 49 was amended in 1978 to prohibit the use of Form 103.1 in, inter alia, administrative appeals. The court procedure for taking an appeal from an administrative decision is by complaint and citation as set forth in Practice Book Form 204.7. The motion to dismiss on this ground was denied by the Superior Court, *Celotto, J.* We conclude, under the circumstances of this case, that Chestnut Realty's lack of compliance with Practice Book § 49 was not fatal to its appeal from the CHRO's decision.

---

[2] "[Practice Book] Sec. 49. MESNE PROCESS

"Mesne process in civil actions shall be a writ of summons or attachment, describing the parties, the court to which it is returnable and the time and place of appearance, and shall be accompanied by the plaintiff's complaint. Such writ may run into any judicial district or geographical area and shall be signed by a commissioner of the superior court or a judge or clerk of the court to which it is returnable. Except in those actions and proceedings indicated below, the writ of summons shall be on a form substantially in compliance with Form 503.1 (JD-FM-3) in family actions and with Form 103.1 (JD-CV-1) in other civil actions. If any person is proceeding without the assistance of counsel, he shall sign the complaint and present the complaint and proposed writ of summons to the clerk; the clerk shall review the proposed writ of summons and, unless it is defective as to form or does not contain a bond for prosecution pursuant to Sec. 51, shall sign it.

"Form 503.1 (JD-FM-3) and Form 103.1 (JD-CV-1) shall not be used in the following actions and proceedings which are commenced after the effective date of this amendment (January 16, 1978):

(1) Applications for change of name.

(2) Proceedings pertaining to arbitration.

(3) Probate appeals.

(4) Administrative appeals.

(5) Juvenile court appeals.

(6) Verified petitions for paternity.

(7) Verified petitions for support orders.

(8) Any actions or proceedings in which an attachment, garnishment or replevy is sought.

"A plaintiff may, before service on a defendant, alter printed forms JD-FM-3 and JD-CV-1 in order to make them conform to any amendments to Practice Book Forms 503.1 or 103.1 or to any relevant amendments to Practice Book rules. (See Gen. Stat., § 52-89 and annotations.)"

We note at the outset that appeals from administrative agencies exist only under statutory authority. *Farricielli* v. *Personnel Appeal Board,* 186 Conn. 198, 201, 440 A.2d 286 (1982). "A statutory right to appeal may be taken advantage of only by strict compliance with the statutory provisions by which it is created." Id. We have recognized, therefore, that the absence of a citation, signed by a competent authority, as required by General Statutes § 4-183 (b), renders an administrative appeal fatally defective. *Village Creek Homeowners Assn.* v. *Public Utilities Commission,* 148 Conn. 336, 338–40, 170 A.2d 732 (1961). We have also held mandatory the provisions of the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., that impose time limitations; *Zoning Board of Appeals* v. *Freedom of Information Commission,* 198 Conn. 498, 503, 503 A.2d 1161 (1986); *Royce* v. *Freedom of Information Commission,* 177 Conn. 584, 587, 418 A.2d 939 (1979); as well as the venue requirements of the UAPA; *Farricielli* v. *Personnel Appeal Board,* supra; and that lack of compliance with these provisions renders an appeal subject to dismissal. These decisions focused on whether the provisions in question were jurisdictional and thus essential to the validity of the appeal. *Zoning Board of Appeals* v. *Freedom of Information Commission,* supra; *Farricielli* v. *Personnel Appeal Board,* supra, 207.

The use of an improper form to commence an appeal, however, presents a different situation. As long as it contains a proper citation, signed by a competent authority, its use does not call into question the jurisdiction of the Superior Court to entertain the appeal. See General Statutes § 4-183 (b). Practice Book Form 204.7 merely establishes a method of service upon the administrative agency in a manner different from other civil actions, to wit, by registered or certified mail. See Public Acts 1979, No. 79-163. If the form, as it did in

this case, clearly apprises all concerned that a lawsuit is being instituted, and contains notice of the return date, and the requirement for filing an appearance, and also directs a competent authority to summon the defendant, then the policy of giving notice to the defendant of the nature of the proceedings has been served. Cf. *Village Creek Homeowners Assn.* v. *Public Utilities Commission,* supra. Absent an affirmative showing of prejudice by the defendant; see General Statutes § 52-123; *Village Creek Homeowners Assn.* v. *Public Utilities Commission,* supra, 340; *United States Envelope Co.* v. *Vernon,* 72 Conn. 329, 44 A. 478 (1899); we conclude that the mistaken use of Form 103.1 (JD-CV-1) does not warrant the dismissal of an administrative appeal.

Next, the CHRO claims that the appeal should have been dismissed because Chestnut Realty failed to name and serve the hearing officer as the tribunal pursuant to General Statutes (Rev. to 1983) § 4-183 (b).[3] We disagree.

General Statutes (Rev. to 1983) § 4-183 (b) provides that all "[c]opies of the petition [of appeal] shall be served upon the *agency* and all parties of record within thirty days after mailing of such notice or, if a rehearing is requested, thirty days after the decision thereon,

_____

[3] General Statutes (Rev. to 1983) § 4-183 (b) provides: "Proceedings for such appeal shall be instituted by filing a petition in superior court for the judicial district of Hartford-New Britain or for the judicial district wherein the aggrieved person resides or if such person is not a resident of this state to the court for the judicial district of Hartford-New Britain within forty-five days after mailing of the notice of the final decision of the agency or, if a rehearing is requested, within forty-five days after the decision thereon. Copies of the petition shall be served upon the agency and all parties of record within thirty days after mailing of such notice or, if a rehearing is requested, thirty days after the decision thereon, except that service upon an agency may be made by mailing a copy of the petition by registered or certified mail, postage prepaid, to the office of the commissioner of the agency or to the office of the attorney general in Hartford."

except that service upon an agency may be made by mailing a copy of the petition by registered or certified mail, postage prepaid, to the office of the commissioner of the agency or to the office of the attorney general in Hartford." (Emphasis added.) The Appellate Court in *Catholic Family & Community Services* v. *Commission on Human Rights & Opportunities,* 3 Conn. App. 464, 466–68, 489 A.2d 408 (1985), specifically held that a hearing examiner appointed by the CHRO was not an "agency" under General Statutes § 4-183 (b) and therefore did not have to be served with the plaintiff's petition. See *Board of Education* v. *Department of Education,* 198 Conn. 445, 450–52, 503 A.2d 1147 (1986). We adopt the reasoning of the Appellate Court on this issue and conclude that the trial court was correct in not dismissing the appeal.

## II

The CHRO next claims that the Superior Court erred in reversing the tribunal's finding that the complainant had made out a prima facie case of prohibited discriminatory action. We agree. We find that, under the circumstances of this case, the tribunal applied the correct standard for determining whether the complainant had made out a prima facie case.

This court recently held that in addressing claims under General Statutes § 46a-64 (formerly General Statutes § 53-35 [a]), "we are properly guided by the case law surrounding the federal fair housing laws, 42 U.S.C. §§ 3601 through 3631,[4] even though there may be differences between the state and federal statutes." *Zlokower* v. *CHRO,* 200 Conn. 261, 264, 510 A.2d 985

---

[4] Title 42 of the United States Code, § 3604, provides in part:
"DISCRIMINATION IN THE SALE OR RENTAL OF HOUSING.
"As made applicable by section 3603 of this title and except as exempted by sections 3603 (b) and 3607 of this title, it shall be unlawful—
"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavail-

(1986); see *Department of Health Services* v. *CHRO,* 198 Conn. 479, 489, 503 A.2d 1151 (1986); *Wroblewski* v. *Lexington Gardens, Inc.,* 188 Conn. 44, 53, 448 A.2d 801 (1982). "[F]ederal courts in construing the federal fair housing laws have uniformly adopted the evidentiary requirement articulated by the United States Supreme Court in federal employment discrimination cases, that the complainant must at the outset establish a prima facie case of discrimination." *Zlokower* v. *CHRO,* supra, 265; see, e.g., *Hamilton* v. *Svatik,* 779 F.2d 383 (7th Cir. 1985); *Phillips* v. *Hunter Trails Community Assn.,* 685 F.2d 184, 190 (7th Cir. 1982); *Robinson* v. *12 Lofts Realty, Inc.,* 610 F.2d 1032, 1038 (2d Cir. 1979); *Smith* v. *Anchor Building Corporation,* 536 F.2d 231, 233 (8th Cir. 1976); *In re Malone,* 592 F. Sup. 1135, 1166 n.21 (E.D. Mo. 1984); see also *McDonnell Douglas Corporation* v. *Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Once the complainant establishes a prima facie case, the burden shifts to the respondent to articulate a legitimate nondiscriminatory reason for its actions. *Phillips* v. *Hunter Trails Community Assn.,* supra; see also *McDonnell Douglas Corporation* v. *Green,* supra. In *Zlokower* v. *CHRO,* we indicated that those federal standards have been adopted in state employment discrimination cases; *Wroblewski* v. *Lexington Gardens, Inc.,* supra, 53; and held them applicable to actions brought under General Statutes § 46a-64 (formerly General Statutes § 53-35 [a]). *Zlokower* v. *CHRO,* supra, 265.

ble or deny, a dwelling to any person because of race, color, religion, or national origin.

"(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin.

\* \* \*

"(d) To represent to any person because of race, color, religion, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."

In determining whether a prima facie case of intentional discrimination in housing has been established, most federal courts have adopted a standard similar to the standard articulated by the United States Supreme Court in *McDonnell Douglas Corporation* v. *Green,* supra, which involved a title VII claim of employment discrimination.[5] "Under federal law an individual . . . *may* meet his initial burden of establishing a prima facie case by proving that (1) he is a member of the statutorily protected class, (2) he has applied for and was qualified to rent or purchase the unit involved, (3) he was rejected by the respondent, and (4) the housing opportunity remained available thereafter." (Emphasis added.) *Zlokower* v. *CHRO,* supra, 266, citing *Phillips* v. *Hunter Trails Community Assn.,* supra; *Robinson* v. *12 Lofts Realty, Inc.,* supra; *Davis* v. *Mansards,* 597 F. Sup. 334, 345 (N.D. Ind. 1984); see generally Schwemm, Housing Discrimination Law (1983) pp. 405–406; but see *Hamilton* v. *Svatik,* supra.

The CHRO, in finding that the complainant had made out a prima facie case, applied only the first three prongs of this standard and found that the complainant, a black individual, was in a protected class, that he made an offer to purchase lot 7, and that he was ready, willing, and able to buy, and was rejected. No finding was made as to the last prong of the federal standard, i.e., whether the property remained available thereafter.

---

[5] *McDonnell Douglas Corporation* set forth the following elements necessary to make out a prima facie case of employment discrimination:

1. The complainant is a member of a racial minority;

2. The complainant applied for an opportunity and was qualified for the opportunity;

3. The opportunity was denied to the complainant;

4. After the opportunity was denied, the opportunity was offered to others so qualified.

*McDonnell Douglas Corporation* v. *Green,* 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

The Superior Court concluded, therefore, that because there was no evidence in the record with respect to the continuing availability of the property after the complainant's offer was rejected, the complainant had not made out a prima facie case.

In stating the elements necessary to establish a prima facie case of discrimination, the United States Supreme Court noted in *McDonnell Douglas Corporation* that the standards must be tailored to the particular facts of each case. *McDonnell Douglas Corporation* v. *Green,* supra, 802 n.13; see also *Texas Department of Community Affairs* v. *Burdine,* 450 U.S. 248, 254 n.6, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). In a later decision, the Supreme Court stated that the *McDonnell Douglas Corporation* decision "did not purport to create an inflexible formulation" for a prima facie case of discrimination. *International Brotherhood of Teamsters* v. *United States,* 431 U.S. 324, 358, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). The "importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion. . . ." Id. This reasoning is equally applicable to cases involving housing discrimination. See *Zlokower* v. *CHRO,* supra.

The factual situation in this case prevents application of the fourth prong in establishing a prima facie case as stated in *Zlokower* v. *CHRO,* supra. See also *McDonnell Douglas Corporation* v. *Green,* supra. The record indicates that Barboza filed his complaint with the CHRO three days after he was informed that the Schaefers had decided not to sell the property. It defies logic to assume that a seller will continue to offer the property for sale on the open market after a ready, willing and able buyer, who was denied the opportunity

to purchase, has filed a housing discrimination complaint with the CHRO. Although evidence of the continuing availability of the property would provide a stronger inference of disparate treatment; see, e.g., *Texas Department of Community Affairs* v. *Burdine,* supra, 254; it was not an error of law for the tribunal to find that a prima facie case had been made out without such evidence. We hold that the Superior Court erred in reversing the tribunal's finding that the complainant had made out a prima facie case of housing discrimination.

### III

The CHRO next claims that the Superior Court erred in reversing the tribunal's finding that the respondent had failed to show a legitimate nondiscriminatory reason for refusing to sell lot 7. The trial court concluded that all that is required of the respondent to rebut a prima facie case is to articulate clearly a nondiscriminatory reason for his conduct. It found that the CHRO tribunal instead placed the burden on the respondent to prove a nondiscriminatory reason for withdrawing the lot from the market. We agree with the trial court and find that the tribunal improperly shifted the burden of proof to the respondent.

The United States Supreme Court decision in *Texas Department of Community Affairs* v. *Burdine,* supra, provides a detailed explanation of the applicable evidentiary burdens in proving a claim of discrimination. Once a prima facie case is established, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " Id., 253, citing *McDonnell Douglas Corporation* v. *Green,* supra, 802. "The defendant need not '*persuade* the court that it was actually motivated by the proffered reasons.' [Citations omitted.] It is sufficient if the defendant's evidence raises a genuine issue of fact as

to whether it discriminated against the plaintiff."
(Emphasis added.) *Texas Department of Community
Affairs* v. *Burdine,* supra, 254–55; see *Wroblewski* v.
*Lexington Gardens, Inc.,* 188 Conn. 44, 61, 448 A.2d
801 (1982). "The ultimate burden of persuading the
trier of fact that the defendant intentionally discrimi-
nated against the plaintiff remains at all times with the
plaintiff." *Texas Department of Community Affairs* v.
*Burdine,* supra, 253.

An examination of the record in this case reveals that,
rather than assigning a burden of production, the tri-
bunal placed the burden of proof on the respondent to
show a legitimate nondiscriminatory reason for its
refusal to sell. The respondent's rebuttal of Barboza's
claim of discrimination consisted of testimony that the
Schaefers had plans to build a smaller retirement home
on lot 7 since January, 1973. Although not indicating
what lot they applied for, Schaefer had plans for a home
drawn up in June, 1977. Schaefer testified, however,
that he could not afford to build a home on lot 7 until
he had sold his home on lot 5. During this time period,
the Schaefers' home on lot 5 remained on the market.
As of September, 1977, the Schaefers claimed that they
had not received an acceptable offer on lot 5 to enable
them to sell and build on lot 7. Schaefer testified that,
after he had shown lot 7 to Barboza, his wife reiter-
ated her desire to build their retirement home on that
lot and that they decided not to sell the property. The
tribunal weighed and rejected this evidence stating
that the respondent had "failed to *produce* any evidence
that there was any change in the saleability of lot 5
between September 11, [1977, the date Barboza viewed
lot 7,] and September 13, [1977, the date lot 7 was
removed from the market,] to give any credible non-
discriminatory reason for withdrawing lot 7 from the
market . . ." (emphasis added) thereby, in effect, shift-
ing the burden of proof improperly to the respondent.

Upon remand, the tribunal is directed to determine whether the respondent has articulated a legitimate nondiscriminatory reason for its conduct. If the respondent carries this burden of *production,* the prima facie case is rebutted and the complainant then has the ultimate burden of persuasion to demonstrate that the proffered reason is pretextual. See *Texas Department of Community Affairs* v. *Burdine,* supra, 256; *Wroblewski* v. *Lexington Gardens, Inc.,* supra, 61.

## IV

Finally, the CHRO claims that the trial court erred in reversing the tribunal's order of relief concerning the option to purchase a lot similar to lot 7 for the 1977 price in 1983. We disagree. The trial court held that "[i]n awarding the complainant the option to purchase a similar lot in the owner's subdivision for the 1977 price in 1983, the Hearing Officer sought to have the owner shoulder the burden of increased real estate values and inflation between 1977 and 1983." It reasoned that this option went well beyond the common law measure of compensatory damages. The CHRO argues on appeal that the trial court's rationale defeats the purpose of our Public Accommodations Act and civil rights laws generally to eradicate discrimination and to make persons whole for injuries suffered through discrimination.

General Statutes (Rev. to 1977) § 53-36[6] defined the damages a tribunal could assess if it found that the

---

[6] "[General Statutes (Rev. to 1977)] Sec. 53-36. COMPLAINT TO COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES. COMMISSION MAY ISSUE COMPLAINT. DAMAGES. In addition to the penalties provided for violation of sections 53-34, 53-35 and 53-35a, any person claiming to be aggrieved by a violation of any such section may, by himself or his attorney, make, sign and file with the commission on human rights and opportunities a complaint in writing under oath which shall state the circumstances of such violation and the particulars thereof and shall contain such other information as may be required by the commission. In addition, the commission, whenever it

respondent had engaged in an unlawful practice under General Statutes § 53-35 (a). That authority is now provided in General Statutes § 46a-86 (c). "[I]t shall . . . determine the damage suffered by the complainant, which damage shall include but not be limited to the expense incurred by the complainant for obtaining alternative housing or space, storage of goods and effects, moving costs, attorney's fees and *any other costs actually incurred by him* as a result of such unlawful practice." (Emphasis added.) While the plain language of this provision does provide the tribunal with discretion to fashion types of relief other than those types specifically mentioned, it limits such relief to that "actually incurred by the plaintiff." Id. Any other interpretation of the statute would vest the hearing officer with unbridled discretion. It has been held that the purpose of actual damages in a fair housing case "is to put the plaintiff in the same position, so far as money can do it, as he would have been had there been no injury or breach of duty, that is, to compensate him for the injury actually sustained." *Lee* v. *Southern Homes Sites*

has reason to believe that section 53-34, 53-35 or section 53-35a has been or is being violated, may issue a complaint. The commission may thereupon proceed upon any such complaint pursuant to section 53-34, 53-35 or 53-35a in the same manner and with the same powers as provided in chapter 563 in the case of unfair employment practices, and the provisions of said chapter as to the powers, duties and rights of the commission, the tribunal, the complainant, the court, the attorney general, the counsel for the commission and the respondent shall apply to any proceeding under the provisions of this section. In the investigation of any complaint, filed pursuant to section 53-35, or section 53-35a, the commission may issue subpoenas requiring the production of records and other documents relating to the complaint under investigation. If upon all the evidence the hearing tribunal finds a respondent has engaged in an unlawful practice prohibited by section 53-34, 53-35 or 53-35a, it shall state its findings of fact and it shall, in addition to any other action which it may take hereunder, determine the damage suffered by the complainant, which damage shall include but not be limited to the expense incurred by the complainant for obtaining alternative housing or space, storage of goods and effects, moving costs, attorney's fees and any other costs actually incurred by him as a result of such unlawful practice."

*Corporation,* 429 F.2d 290, 293 (5th Cir. 1970); see generally Schwemm, supra, pp. 253–60. Ordinarily measuring damages by the appreciation in land from the time of an alleged act of discrimination to the time of trial goes well beyond injuries actually sustained. In the usual circumstances it results in creating a windfall profit to the complainant. Any award of damages that is punitive in nature is authorized neither under General Statutes § 53-36 nor under the common law of Connecticut. See *National Semiconductor* v. *Allendale Mutual Ins. Co.,* 547 F. Sup. 1195, 1201 (D. Conn. 1982).

There is error in part, the judgment is set aside and the case is remanded to the trial court with direction to remand the case to the commission on human rights and opportunities for further proceedings in accordance with this opinion.

In this opinion the other justices concurred.