[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff brought this action originally in six counts claiming damages against the named defendants arising out of an alleged unlawful termination of her employment. The three counts remaining are the first count, asserting a violation of 31-51g of the Conn. Gen. Stats., the second count, which repeats the allegations of the first count, but adds allegations regarding damages, and the fifth count, which is based on alleged violations of the plaintiff's free speech rights under the United States and Connecticut Constitutions.
FINDINGS OF FACT
The court finds the following material facts established by a fair preponderance of the evidence.
At all relevant times, Blue Hills Hospital was an alcohol and drug abuse treatment facility operated by the Connecticut Department of Mental Health. Audrey Worrell was, at all pertinent times, the Commissioner of the Connecticut Department of Mental Health. Stephen Glass was Superintendent of Blue Hills Hospital from 1982 to 1988. Henry Howard is currently and was at all relevant times Personnel Director at Blue Hills hospital.
Keith Osborne was, from 1981 to 1985, Director of Admissions at Blue Hills Hospital, and Barbara Vince's immediate supervisor. Lamar Eberhardt has been the Affirmative Action Officer and Patients' Rights Advocate at Blue Hills Hospital since 1982. Phyllis Kelleher is CT Page 7299-B currently and was assistant director of nursing at Blue Hilis Hospital. Joyce Gibson is currently and was, at all relevant times, the director of nursing at Blue Hills Hospital.
Plaintiff Barbara Vince began employment at Blue Hills Hospital as a part-time clerk/receptionist in the North Lobby in January of 1981. She was employed there from January 7, 1981 to September 28, 1984. Keith Osborne was Vince's supervisor; Osborne was responsible for scheduling hours and for sending Vince's hours to payroll. Vince's regular hours of work were Wednesday and Thursday, 4:00 to 9:00 P.M., and Saturday 1:00 to 9:00 P.M. Osborne also worked on Thursday evenings which were the only times that Vince worked with Osborne.
From the commencement of her employment at Blue Hills Hospital in January 1981 to the time of her discharge in October 1984 Vince received satisfactory employee evaluations and regular pay raises.
In September of 1982, a patient, Linda Davis, complained that Osborne sexually abused her in his office. Davis left Osborne's office very upset and saw Vince, whom she told that Osborne had sexually abused her. Davis claimed that she reported this incident to Vince rather than Osborne's superiors because she claimed that other women had reported similar incidents and were not believed. Davis gave Vince a written account of her experiences with Osborne. After Davis told Vince about the complaint, Vince asked Linda Davis to write a letter about Osborne. Vince did not initiate Davis' complaint concerning Osborne; Davis' oral and written statements were voluntary. Vince received a letter from Linda Davis (Exhibit E) which was written in September, 1982. Vince thought the first letter had been lost and so informed Davis, who wrote her statement again and gave it to Vince. The second letter (Exhibit F) was given to Vince by Linda Davis in September, 1982. Vince subsequently found the first letter. Vince then completed a "Personnel Incident Report" regarding the incident and submitted it to Howard, the Personnel Director at Blue Hill, Hospital, who told her that "he would take care of it." Vince did not, however, give the letters to Howard because she did not trust Howard. CT Page 7299-C
Vince was required by Commissioner's Policy Statement No. 29 to report any patient abuse. (Plaintiff's Exhibit S). Failure to report patient abuse was a ground for termination from Blue Hills Hospital. Commissioner's Policy Statement No. 29 also provided that "[a]ll reported incidents of patient abuse must receive a thorough investigation, regardless of the nature of the complaint." Howard was aware of his duty to investigate promptly any allegations of sexual abuse of patients. Commissioner's Policy Statement No. 29 did not specify that a complaint be in writing — (Plaintiff's Exhibit S). Howard's position regarding the complaint made by Vince was that, in order to undertake an investigation of the allegations against Osborne, he needed the complaint to be in writing.
Osborne was aware of the state's policy against sexual abuse of patients. Allegations of sexual misconduct with patients involve violations of a very serious nature.
In 1983 or 1984, Amini Scaria, head nurse in the detox unit, received a complaint from a patient "of a sexual nature" about Osborne. Scaria wrote a report and submitted it to Glass by sliding it under his door after hours. The next day Joyce Gibson, Director of Nursing, called Scaria into her office, told her that she had heard about some complaints that Scaria had received about Osborne, and told Scaria to "let Barbara [Vince] do her own thing and don't get involved." In early 1984, Vince received letters from three other patients, Marlene Thebeault, Stanley Michalkiewicz, and Shirley Randolph, containing allegations of sexual misconduct by Osborne (plaintiff's Exhibits G, H, and I).
Vince turned the patients' letters over to her attorney, Richard Tulisano. Vince told Howard in March 1984 that the letters were in the possession of her attorney. On July 10, 1984, during a meeting with Howard and Hawkins, Vince informed Howard of the written and oral statements alleging Osborne's harassment and abuse of female patients. Also during the July 10, 1984 meeting with Howard and Hawkins, Vince informed Howard that the letters from patients could be viewed at her attorney's office. Vince's attorney, Richard Tulisano, wrote to Osborne by letter dated CT Page 7299-D July 23, 1984, informing him that the letters were in his possession, and stating, "If you have any question, please feel free to contact me. . . ." Both Glass and Howard, as well as Osborne, knew about Attorney Tulisano's letter. None of the defendants ever attempted to contact Attorney Tulisano regarding the letters. In fact, Glass "most likely" told Osborne not to contact Attorney Tulisano. Vince received a letter (Exhibit G) from Marlene Thebeault on March 16, 1985. She received a letter (Exhibit G) from Stanley Michalkiewicz at the same time. Vince received a letter (Exhibit I) from Shirley Randolph on Saturday, March 17, 1984. Vince did not give any of these letters to Henry Howard at the Hospital.
Patient abuse by employees came within Howard's responsibility. Vince first complained to Howard about alleged patient abuse by Osborne in March, 1984. By March, 1984, Howard had not received sufficient information from Vince which enabling him to investigate her allegations. At that time Vince refused to give Howard her lawyer's name, the names of any patients, or copies of any letters in March, 1984. Vince told Howard that she wanted him to help her get rid of Osborne. Howard's actions with respect to Exhibit K were motivated in part by his belief that Vince had solicited letters from an intoxicated patient who later retracted her statements about Osborne. Howard also understood that this same patient complained about Vince asking her to write things about Osborne which were not true.
Linda Davis was last in Blue Hills Hospital in 1988. Osborne admitted her each time she was admitted. Davis claimed that Osborne asked her how she would feel about making love to an older man. According to her, he had a picture of his wife and two children on his desk. Davis claimed that the incident concerning Osborne took place during the day. Davis was 38 years old at the time of her testimony. Davis was refused admission to Blue Hills Hospital in 1984 or 1985 by Osborne and this made her angry.
As Director of Admissions, Osborne screened patients for admission to the hospital. He did not treat patients. Osborne's decision whether to admit a patient was reviewed by a medical doctor. Osborne's office was small, with two CT Page 7299-E large windows facing a public driveway. The window drapes in his office were always open. The door to his office was almost always open. Two clerks sat at desks facing Osborne's office and could see into his office.
Osborne first had problems with Vince in July of 1982 when she reported an incident to others but not to Osborne, her supervisor. Osborne counselled Vince with respect to her job performance in December, 1982. Although counselled about reporting procedures, Vince complained to other staff about Ethel Sally and did not report to Osborne. Vince was counselled by Osborne about the Sally incident. During Osborne's counseling sessions Vince almost always had difficulty accepting responsibility for the behavior; she would get angry and blame others.
Vince told Osborne she had letters from patients after he had counselled her in March, 1984. Osborne reprimanded Vince in March, 1984 for posting a memo in which she assumed supervisory responsibilities over Osborne's staff. Osborne claimed that, in March, 1984, he received a call from a patient, Shirley R., in which she told him that Vince had coerced her into writing a letter stating that Osborne had approached her sexually, that she had written the letter, and that it was not true. Osborne notified the Affirmative Action Officer, Lamar Eberhart, that he had received the call by memo dated 3/22/84 (Exhibit 7). He asked Eberhart to investigate the incident.
On March 29, 1984, Osborne gave Vince an inter-departmental message consisting of a "position expectations memo" — (Plaintiff's Exhibit K). In the position expectations memo, Osborne warned Vince that continuing to engage in "activit[ies] which [are] detrimental to the best interest of the agency or of the state" would result in her dismissal (Plaintiff's Exhibit K). In the position expectations memo, one of the activities alleged to be detrimental to the best interest of the agency or of the state was that Vince had accused Osborne of sexual harassment of patients (Plaintiff's Exhibit K). Employees have a right and an obligation to report sexual abuse of patients by their supervisor. In the position expectations memo, one of the activities alleged to be detrimental to the best interests of the agency or of the state was that Vince CT Page 7299-F had stated to staff that she had in her possession letters from patients alleging sexual misconduct by Osborne (Plaintiff's Exhibit K). Vince had the right to talk to staff in the commonly accepted meaning of those terms, about patient abuse. Also, in the position expectations memo, one of the activities alleged to be detrimental to the best interests of the agency or or the state was that Vince posted a memo to staff regarding a procedure for reporting violations by nursing personnel (plaintiff's Exhibit K). The memo-posting incident to which the position expectations memo referred involved a memo posted by Vince regarding the reporting of violations of hospital procedure by nursing personnel. The hospital prohibits certain items from being passed through to patients. The hospital has a written policy that states what food is allowed to be passed through to patients — (Plaintiff's Exhibit C). One of Vince's duties was to inspect packages and make sure that no prohibited items were passed through.
On March 16, 1984, Vince declined to allow a package through to a patient, because doing so would have violated the rule regarding what could and could not be passed through. Vince drafted a memo and posted it inside her station on March 16, 1984. Vince's March 16, 1984 memo listed the items that were allowed to be passed through to patients, and stated that anyone passing through prohibited items should be reported. Vince posted the memo on the inside of her station. Osborne removed the memo the next day. There was no written rule as to the posting of such memos. Vince could have been reprimanded for passing through items not allowed to be passed through to the patients.
In the position expectations memo, another of the activities alleged to be detrimental to the best interests of the agency or of the state was that Vince "allegedly" stated to staff that she was upset that Osborne had removed that memo — (Plaintiff's Exhibit K). The position expectations memo also outlined Osborne's expectations of Vince — (Plaintiff's Exhibit K). One of the expectations outlined in the position expectations memo was that Vince was to report to work as scheduled and complete duties and tasks as assigned by Osborne — (Plaintiff's Exhibit K). CT Page 7299-G
One of the expectations outlined in the position expectations memo was that Vince was not to conduct any hospital business while not on duty nor engage in conversations with patients or other staff regarding her personal opinions about policies within the detox unit before, during, or after scheduled hours of work (Plaintiff's Exhibit K). Howard would have limited this expectation to conversations with patients, because employees have the right to speak to each other and express their opinions to each other, and also have the right to do so after work. Blue Hills Hospital wanted Vince to stop communicating with staff persons.
Another expectation outlined in the position expectations memo was that Vince was not to post or otherwise distribute written materials to staff or patients without the approval and/or signature of Osborne — (Plaintiff's Exhibit K). Employees generally have the to communicate with staff members without the written approval of their supervisor. One of the expectations outlined in the position expectations memo was that Vince was not to discuss the admission, discharge, or course of a patient's treatment without "appropriate authorization" (Plaintiff's Exhibit K). One of the expectations outlined in the position expectations memo was that Vince should direct any complaints about or problems that she had with other staff members to Osborne — (Plaintiff's Exhibit K). At the end of the position expectations memo, Osborne warned Vince that failure to meet the expectations outlined in the memo would result in disciplinary action up to and including dismissal — (Plaintiff Exhibit K). From the time of her complaints about Osborne in March 1984 to the time of her discharge, relations between the two deteriorated. In fact, following his issuance of the positions expectation memo and during the time period between March 1984 and October 1984, Osborne wanted Vince to be dismissed. Osborne was responsible for bringing to the attention of the administration all of the incidents that formed the bases for Vince's dismissal. Vince requested that she be transferred to a night other than Thursday, so that she and Osborne would not have to work at the same time, but Osborne refused.
Vince was suspended for three days in July, 1984. CT Page 7299-H She received a suspension letter (Exhibit O) dated September 10, 1984 and was suspended from her position at the hospital on September 28, 1984. Vince received a termination letter (Exhibit P) dated October 1, 1984. Vince was terminated from her position at the hospital on October
On July 26, 1984, Vince was suspended without pay for three working days because of alleged "misconduct" (Plaintiff's Exhibit L). The "misconduct" described by Glass included two episodes in which Vince had complained of discrepancies with her paycheck. Vince experienced several problems with her paychecks, resulting in the two episodes noted in the July suspension letter, where Vince became upset because her paychecks were not accurate. She did have a right to ask questions about her paychecks.
At the end of June, 1984, Vince was very upset and very angry over her paycheck, accusing Osborne of shorting her and not sending the proper information to the business office. At this time, Vince told Osborne in a very loud and angry manner that he was against her. Vince was again very angry and very loud over her paycheck while in the business office the next day. There was nothing wrong with Vince's paycheck at this time. She never lost money in a paycheck. Vince was upset over her paycheck approximately once a month prior to this incident. Osborne counselled Vince concerning these incidents on July 5, 1984.
Shortly after Vince's termination it was discovered that Neville Roberts, the payroll clerk at Blue Hills Hospital, had been embezzling from the hospital. Roberts was caught when he cashed an overtime check made payable to Vince. No employee, including Vince, ever lost money because of Roberts' actions. The July 26, 1984 suspension letter also referred to an incident where Vince had admonished an Agency Police Officer for not arresting an intoxicated visitor who had threatened her.
The police officer episode involved two intoxicated visitors who raised their voices in anger and swore at Vince. Vince raised her voice and summoned the agency police to the lobby.
Police officer Oliveiri told Osborne on July 5 about CT Page 7299-I the incident involving Vince wherein Vince yelled at Oliveiri, told him he should have arrested a person, and was demeaning and called him names. Oliveiri recalled four incidents involving Vince and visitors wherein the visitors told Oliveiri that Vince was harassing them and calling them names. During one incident in June of 1984, Oliveiri observed the interaction between Vince and two visitors. Vince claimed to Oliveiri that the visitors threatened her and that they should be arrested. Several days later Vince called Oliveiri to the lobby and called him a coward for failing to arrest the visitors. Vince's behavior with the visitors was very hostile. Vince's behavior was very inappropriate, in that she "escalated situations" by name calling, raising her voice, leaning over the counter, pointing her finger and demanding they leave. Oliveiri reported the June incident to Osborne. Vince did not report Osborne to the Agency Police, to Oliveiri's knowledge, although she often reported other incidents. Vince called the visitors disparaging names. Oliveiri considered Vince's behavior to be inappropriate.
Osborne was suspended from his job and subsequently terminated. He was reinstated after grieving his termination. Vince's job performance evaluation covered only the time period from September 1, 1982 to September 1, 1983. Anything which occurred before or after those dates would not be considered in that evaluation. Osborne did not have the authority to fire Vince. Osborne gave Vince the opportunity to discuss the contents of the position expectation memo and to ask questions. Vince did not ask any questions about the memo. Vince's suspension was disciplinary, while Osborne's suspension was pending an investigation. Osborne discussed the position expectation memo with Vince. The position expectation memo was a collaborative effort between the personnel office and Osborne. The purpose of the position expectation memo was to get Vince to change her behavior, to stop stating to staff that she had letters from patients but refusing to show them, to stop talking to patients about Osborne and to stop directing Osborne's staff as to matters which were not her responsibility.
About July 5, a patient, Albina S., told Osborne that Vince approached her and said she knew Osborne and CT Page 7299-J Albina were involved sexually, that Vince had letters from other patients, and that Vince was out to get Osborne fired. The patient was upset and Osborne told her to talk with the Affirmative Action Officer. Osborne reported this incident to Eberhart and Glass the next day. Osborne was not involved in the decision to suspend Vince in July.
Osborne received a letter from Attorney Tulisano at the end of July which he brought to Glass. Osborne did not know the identity of Vince's lawyer prior to this time. Osborne wrote a memo to Glass in early September wherein he described an incident involving Vince, Marsha Nash, and patient confidentiality. At this time, Vince told Osborne of a breach of patient confidentiality by Nash, but she refused to give Osborne the patient's name. In September Osborne was given information by his staff about Vince and a patient, Marsha C. Osborne was told that Marsha C. had been approached by Vince who asked her about having sexual relations with Osborne, that Marsha C. had become upset and left the hospital prematurely. Osborne gave this information to Glass and Eberhart.
Vince told Osborne she had letters about him from patients. Osborne told Vince to bring the letters to the hospital administration. Vince never told Osborne who the patients were. Osborne was 35 years old in 1982. Osborne has never kept pictures of his family on his desk. He did not see patients on Thursday evenings.
Osborne rated Vince less than good in her service rating (Exhibit A) with respect to judgment. It was Osborne's job as supervisor to report problems to the administration.
Vince was hired to work eighteen hours per week. Vince complained to Henry Howard about Osborne from mid-1982, stating that Osborne was not a good supervisor, that he favored other staff over her, but did not substantiate any of her claims. Howard wrote a memo to Vince as a result of his interactions with her and to indicate Vince should go to Osborne first with her concerns. In March 1984, Vince told Howard that he had to help her get rid of Osborne because he was having sexual relations with patients and that she had letters to prove it. This was the first time CT Page 7299-K Vince had complained to Howard about Osborne sexually abusing patients. Howard asked Vince for the statements, or for copies of the statements from patients or the names of the patients and she refused to do any of those things. Howard asked Vince for copies of the letters three or four
Blue Hills Hospital had an established procedure for reporting complaints such as those Vince was voicing. The policy on reporting was given to new employees upon hiring. Vince used the proper reporting form with regard to the Discola investigation.
The purpose of the position expectation memo (Exhibit K) was to get Vince to change her behavior and to stop inappropriate behavior such as that involving the patient Shirley R. Other things the memo was meant to accomplish, according to Howard, was to get Vince to give the information needed for investigation of her claims against Osborne and to stop her from discussing hospital issues with patients and posting directives for other staff. Howard discussed the contents of the July suspension letter with David Sullivan of the Department of Mental Health and with Glass. The Affirmative Action Officer, Lamar Eberhart, discussed the Shirley R. incident with Howard after Osborne reported it by memo (Exhibit 7). Howard attended a meeting with Vince, Eberhart and Julie Murtha to discuss the Shirley R. incident. At that meeting, Vince claimed that Blue Hills Hospital was out to get her (Exhibit 17). Howard first became aware of Attorney Tulisano's involvement with Vince by seeing a copy of Attorney Tulisano's letter (Exhibit M) at this time. At the end of September, Eberhart spoke to Howard concerning an incident with Vince and a patient, Marsha Connors. Eberhart told Howard that Vince, around September 21, had asked Connors about incidents involving Osborne and another patient, as well as Osborne and Connors, but that Vince couldn't talk about it then. Eberhart further said that Connors became upset with the incident and checked out of the hospital against medical advice. A meeting was held with Vince, Eberhart, Howard and a union representative to discuss the Marsha Connors incident on September 28, 1984.
Vince was placed on unpaid leave of absence pending an investigation of the matter. Howard and Eberhart spoke CT Page 7299-L with Connors on October 1st and asked her to put her story in writing. Howard discussed this incident and the confidentiality incident with Dave Sullivan of DMH and the decision was made to terminate Vince.
Howard drafted the letter of suspension (Exhibit O) and the termination letter (Exhibit P) signed by Glass. Vince was terminated for repeated misconduct, including causing a patient to leave the hospital against medical advice, making accusations against staff without providing information so an investigation could be made, for the Shirley Randolph incident, for her behavior regarding her paychecks, for her behavior toward Oliveiri, for the failure to give information during the confidentiality episode and for upsetting other patients. Howard did not receive complaints about Osborne from anyone else. Howard considered Vince's behavior to be patient abuse. Vince's leave without pay was by statute while Osborne's leave with pay was because of a collective bargaining contract. Vince received the lowest "good" rating on her performance appraisal (Exhibit A) for knowledge or work, quantity of work, quality of work, initiative and cooperation, and a "less than good" rating for judgment.
The July, 1984 suspension letter referred to an episode where Vince had allegedly inquired of a patient, Shirley Randolph, whether Osborne had made sexual advances toward her. In the Shirley Randolph episode, Randolph had arrived at the hospital intoxicated and begun making unsolicited statements to Vince regarding Osborne's sexual abuse of patients. Shirley Randolph wrote a statement regarding Osborne's activities, which statement she gave to Vince, but later recanted. Although no hospital official ever attempted to follow up on the allegations of patient abuse by contacting Attorney Tulisano regarding the letters, Lamar Eberhardt, the affirmative action officer, went to patient Shirley Randolph's house to follow up on a complaint regarding Vince. There was no written complaint in the Shirley Randolph situation, but an investigation was nevertheless conducted by Lamar Eberhardt. Eberhart told Glass about the Shirley Randolph incident in March of 1984. Glass told Eberhart to get information from Randolph.
Glass made the decision to write the position CT Page 7299-M expectation memo to Vince. The intent of the suspension letter signed by Glass was to make Vince aware of inappropriate behavior that could be corrected prior to termination. Glass learned of the Marsha Connors incident through Eberhart. Glass considered the Marsha Connors incident extremely serious. Glass felt that Vince forced Connors out of treatment. After the Connors incident, Vince was placed on administrative leave pending an investigation. Glass did not see the patient letters Vince had until mid-1985 when he was shown them by DMH, central office personnel.
Glass had no reason to suspect Osborne of sexually harassing patients. According to Glass, Vince was terminated for failure to follow hospital policies, for failure to refrain from soliciting patients, for failure to refrain from harassing other staff. The Marsha Connors incident was the most important factor in her termination. Vince was not supposed to be involved in patient treatment in any way.
Lamar Eberhart was the affirmative action officer and patient rights advocate at Blue Hills Hospital during the time Vince was employed there. His duties included receiving and investigating patient complaints. In March of 1984 Eberhart was told of a situation involving Shirley R. and Vince by Osborne. Eberhart claimed he was told by Shirley R. that while she was in the hospital in an intoxicated state, Vince approached her and asked her to write and sign a letter that Osborne had molested her and other female patients, which she did; further that Vince asked her to sign a second statement a week later, which she did and that she wanted to retract those statements because Osborne had never done anything to her. Eberhart asked Shirley R. to put her story in writing. He did not instruct her what to write. Shirley Randolph wrote a letter which she gave to Eberhart (Exhibit 14). The letter from Shirley Randolph dated March 30, 1984 states that Vince told her what to write in the earlier letter (Exhibit I) about Osborne. Eberhart gave the letter to Howard. Osborne, on July 6, told Eberhart that a patient named Albina was approached by Vince concerning allegations against Osborne. Eberhart talked with Albina on July 6. Eberhart claimed that Albina stated she had not been molested by Osborne. CT Page 7299-N Albina was nervous, upset and frightened. Eberhart brought the information about Albina to Howard. Vince never came to Eberhart with any complaints nor did she ever give him names of patients. Patients were informed by brochure, posters and in person that Eberhart was the person to whom complaints should be made.
Eberhart met with Vince, Howard and Julie Murtha on July 10, 1984. At that meeting, Vince said Osborne was having sex with patients but did not supply names or copies of the letters. Eberhart spoke with Marsha Connors on September 27, 1984. Eberhart claimed Connors said that Vince asked Marsha if she heard what was going on with Osborne and female patients and that some of it involved Marsha; further that Vince said she couldn't say any more and the next day (September 22, 1984), Marsha asked Vince what she meant and Vince said she couldn't talk. Eberhart concluded that, subsequently, Connors became upset and left the hospital. Eberhart, with Howard, spoke with Connors on October 1, 1984. They asked Connors to put her complaint in writing. They did not tell Connors what to say. Connors wrote the letter (Exhibit 15). The letter indicated that Connors had no idea what Vince was talking about, that she was trying to detox, was very confused, and got upset.
Juana DeCordova was a lead mental health worker at Blue Hills Hospital during the time Vince was employed. DeCordova's office was next to Osborne's office. Both offices are small.
Patients would talk to DeCordova about complaints they would have. No patient, including Linda D. even complained to DeCordova about Osborne. DeCordova's office door was open about two feet from Osborne's door and was kept open all the time. Ms. DeCordova often went into Osborne's office. DeCordova was familiar with Osborne's office. He never saw pictures on Osborne's desk. Osborne interacted well with his staff.
Joyce Gibson was Director of Nursing at Blue Hills Hospital during the time Vince was employed there. Gibson was in her office around 5 P.M. on a Thursday when Vince went to her to complain about her paycheck and wanted Gibson to get her money right away. Vince became hysterical and CT Page 7299-O yelled at Gibson and accused her of keeping Vince's money. Gibson could not get Vince to listen to reason. Gibson witnessed Vince's behavior at other times as inappropriate, out of control and unreasonable. Gibson never received complaints about Osborne. Linda D. complained to Gibson about various things but not about Osborne.
Phyllis Kelleher was the assistant director of nursing at Blue Hills Hospital during the time Vince was employed. Kelleher and Vince worked some of the same hours. Vince complained to Kelleher about Osborne and her hours. On one occasion, Kelleher observed Vince becoming very upset, loud and tearful, and using obscenities in front of the admissions office. Kelleher had Vince evaluated by a doctor for her behavior. Vince never told Kelleher about Osborne molesting patients. Kelleher claimed that, in March, 1984, Shirley Randolph told her that Vince had asked her to write a letter about Osborne sexually harassing her, that it was not true and that Vince paid her to write the letter. Randolph was very tearful and remorseful at this time. Kelleher reported this incident to her supervisor the next day.
Vince received a phone call from a person who complained about the breach of confidentiality by Marsha Nash. When Vince reported the breach, as she was required to do, she declined to disclose the patient's name. The hospital reprimanded Vince for refusing to disclose the name of the patient whose confidentiality had been breached. Vince was terminated, in part, for refusing to divulge the name of the patient whose confidentiality had been breached.
The termination letter stated "It is obvious, at this juncture, that you have failed to meet the expectations outlined by your supervisor in March, and it is for these reasons you are being dismissed."
Subsequent to Vince's termination from Blue Hills Hospital, an investigation was undertaken by the Department of Mental Health concerning allegations that Osborne had sexually molested a patient of the hospital. As a result of the investigation, Osborne was dismissed from Blue Hills Hospital. Osborns appealed his termination, and was reinstated when the patient who had complained failed to CT Page 7299-P testify against him at his appeal. Osborne was not reinstated to his position as Director of Admissions, however.
Vince received a head injury when she was eight years old. She received a serious head injury in an automobile accident in 1959. Vince had an emotional breakdown and was hospitalized three weeks in 1978.
David LaCoss, the plaintiff's expert witness, is a psychiatric social worker. LaCoss' highest degree is a Master of Social Work degree which he received in 1983. LaCoss has counselled Vince approximately 100 times, beginning in 1973. LaCoss met with Vince regularly from 1973 to 1978, three times in 1979 and two times in 1982. LaCoss did not see Vince again until 1988. LaCoss treated Vince for dysthymia during the period 1973 to 1982. LaCoss treated Vince for histrionic personality disorder with paranoid dependent issues during this period. A person with such a condition is very concerned with how they come across to other people, and to be quite demonstrative, expressive, often exaggerate how they are feeling, according to LaCoss. Vince was diagnosed as suffering from dysthymia, atypical brain syndrome and histrionic personality disorder in 1982. Vince is still diagnosed by LaCoss as suffering from the same conditions.
Vince has become more paranoid now than prior to her employment at Blue Hills Hospital. She has difficulty in memory and concentration. Stress exacerbates her condition. Vince saw herself as a victim, whatever the reality was during her employment and termination. Vince would think any disciplinary action against her would be unjust. She would have a tendency to blame others for bad things in her life. Vince showed the same sort of symptoms in 1988 that she showed in 1982. Vince was hostile, paranoid, and mistrustful in 1982. She may be obsessed with what she perceived as her mistreatment at the Hospital. The organic component of Vince's condition will get worse over time. Vince's perception of events, even if wrong, would make her condition worse. Termination for other reasons could cause the same difficulties Vince presently has.
Vince has two ongoing and untreated psychiatric CT Page 7299-Q disorders; first, dysthymia, and second, traumatic brain injury.
Dysthymia is an atypical depressive disorder, longitudinal in nature following the individual through life, often beginning in teenage years or manifesting itself first in teenage years and following on throughout adulthood. Dysthymia occurs in adolescents, or it is witnessed for the first time in adolescence. In dysthymia, persons feel dysphonic as opposed to euphonic, and they continuously feel out of sorts. Dysthymia is a disorder with some biological bases which can be treated. If it is not treated, it will run through the life of an individual. Vince has dysthymia that has continued for some years. Vince has a history of one major psychiatric unipolar depression in 1978 for which she was hospitalized for three weeks. Her dysthymia pre-dated her dismissal from Blue Hills Hospital, as did the episode of major depression which required hospitalization. Vince is currently moderately dysthymic, on a scale of 10, rating 3 or 4. Vince's current moderate dysthymia is not related to the events occurring at Blue Hills Hospital between 1981 and 1984.
Vince's pre-1984 psychiatric problems (dysthymia, and traumatic head injury) would have affected her behavior while employed at Blue Hills Hospital. Vince's pre-1984 psychiatric problems would affect her perception of events while employed at Blue Hills Hospital, as well as her reaction to these events. Her pre-1984 psychiatric problems, preceding her employment at Blue Hills Hospital, set her up to have difficulty in dealing with events which occurred at Blue Hills Hospital. Blue Hills Hospital is a stressful work location. Vince's pre-1984 psychiatric problems could cause her to misinterpret events occurring at Blue Hills Hospital. Vince's current condition and mental state were not caused by her dismissal from Blue Hills Hospital. Vince's condition and mental state could have been exacerbated by her dismissal from Blue Hills Hospital. Vince is currently not being treated for her dysthymia, a psychiatric condition that can be treated.
Vince was not in active psychiatric treatment for three to four years following her termination from Blue Hills Hospital. Vince's failure to seek psychiatric CT Page 7299-R treatment for three to four years following her dismissal from Blue Hills Hospital is indicative that her dismissal from Blue Hills Hospital is not a major contributing factor to her current condition and mental state. Vince's organic brain disorder would not have abated had she not worked at Blue Hills Hospital because the disorder, by its nature, does not abate. Vince's dysthymia would have continued whether or not she worked at Blue Hills Hospital.
Analysis of Issues
General Statutes 31-51q states that
 Any employer, including the state or any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of the constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs for any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.
In order to prove a violation of this statute, the plaintiff must prove, by a preponderance of the evidence, that (1) she was exercising rights that are protected by thefirst amendment of the United States Constitution or applicable sections of the Connecticut Constitution; (2) that she was fired "on account of" the exercise of such rights; and (3) that the exercise of her first amendment
rights did not substantially or materially interfere with her bona fide performance or with the working relationship CT Page 7299-S between the employee and the employer.[1]
Because there are no Connecticut cases interpreting this statute, the court relies on federal and state decisions applying federal law to guide the analysis of this cause of action. For that reason, the above-noted elements of this General Statutes 31-51q action must be reconfigured to comport with the federal law analysis used to determine whether a public employee is discharged or disciplined in violation of first amendment rights. The parties appear to agree that the court should adopt the test used in similar actions brought under 42 U.S.C. § 1983. See Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 284-85,97 S.Ct. 568, 50 L.Ed.2d 471 (1977).
Under the Mt. Healthy test, the plaintiff must first prove that her conduct was constitutionally protected. Id., 287. This element requires a two-step inquiry in which the plaintiff must first show that her speech was "on a matter of public concern," and, then, that the employee's free speech rights outweigh the government's interest as an employer. Second, the plaintiff must prove that protected speech or conduct was a substantial or motivating factor in the defendant's adverse employment decision. Id. Third, if the plaintiff meets her burden of proving the first two elements, the defendant must then show, by a preponderance of the evidence, that it would have reached the same decision as to the plaintiff's employment even in the absence of the protected conduct. Id. If the plaintiff meets this test, there is an additional burden not present in the Mt. Healthy analysis, but imposed by General Statutes31-51q. In connection with this element, it must be shown that the exercise of protected rights did not substantially or materially interfere with: (a) the employee's bona fide performance; or (b) the working relationship between the employee and the employer. The Mt. Healthy test, along with the additional Connecticut statutory element, may be used to establish liability under General Statutes 31-51q.
A. First Amendment Protection
The federal constitution merely establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording CT Page 7299-T higher levels of protection for such rights." Cologne v. West Farms Associates, 192 Conn. 48, 57, 469 A.2d 1201
(1984). Neither of the Connecticut appellate courts has determined the extent of the state constitutional protections involved herein, nor have the parties addressed and developed those protections. Under those circumstances, the court will consider the protections provided by the state and federal constitutions as coextensive.
First amendment jurisprudence clearly establishes that a state may not discharge an employee on a basis that infringes upon the employee's constitutionally protected interest in free speech, even if the employee is a probationary or an at-will employee. Rankin v. McPherson,483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1986), citing Perry v. Sindermann, 408 U.S. 593, 597,92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Mt. Healthy v. City Board of Education v. Doyle, supra, 284-85. However, because of the state's compelling interest as employer, the nature of the protection offered by the first amendment differs when the statement is made in the context of a public employment relationship. See Connick v. Meyers, 461 U.S. 138, 147,103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Thus, the government's power as an employer to make hiring and firing decisions on the basis of what its employees say is much greater than its power to regulate expression by the general public. See Pickering v. Board of Education, 391 U.S. 563, 568,88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).
Because of the "enormous variety of factual situations in which critical statements by . . . public employees that may be thought by their superiors to furnish grounds for dismissal," the Supreme Court has declined to "lay down a general standard against which all such statements may be judged." Vasbinder v. Ambach, 926 F.2d 1333,1339 (2d Cir. 1991), quoting Pickering v. Board of Education, supra, 569. Instead, the Court has stated that the determination of whether a public employer has improperly discharged or disciplined an employee for engaging in protected speech requires "a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." Rankin v. CT Page 7299-U McPherson, supra, 284; quoting Pickering v. Board of Education, supra, 568; Connick v. Meyers, supra, 140.
a) "Public Concern"
The threshold question in applying the Pickering balancing test is whether the plaintiff's speech may be "fairly characterized as constituting speech on a matter of public concern." Connick v. Meyers, supra, 146. Whether an employee's speech touches on a matter of public concern must be determined by the content, form, and context of a giver statement. Id., 147-48; Brasslet v. Cota, 761 F.2d 827, 840
(2d cir. 1985).
Two United States Supreme Court cases illustrate what is meant by "a matter of public concern." In Connick v. Meyers, supra, an assistant district attorney was fired after she prepared a questionnaire soliciting the views of her fellow staff members concerning office and personnel policies in the district attorney's office and implicitly Hospital. Osborne appealed his termination, and was reinstated when the patient who had complained failed to testify against him at his appeal. Osborne was not reinstated to his position as Director of Admissions, however.
Vince received a head injury when she was eight years old. She received a serious head injury in an automobile accident in 1959. Vince had an emotional breakdown and was hospitalized three weeks in 1978.
David LaCoss, the plaintiff's expert witness, is a psychiatric social worker. LaCoss' highest degree is a Master of Social Work degree which he received in 1983. LaCoss has counselled Vince approximately 100 times, beginning in 1973. LaCoss met with Vince regularly from 1973 to 1978, three times in 1979 and two times in 1982. LaCoss did not see Vince again until 1988. LaCoss treated Vince for dysthymia during the period 1973 to 1982. LaCoss treated Vince for histrionic personality disorder with paranoid dependent issues during this period. A person with such a condition is very concerned with how they come across to other people, and to be quite demonstrative, expressive, criticizing the district attorney. Id., 141. The court CT Page 7299-V found that the questionnaire, with one exception, did not fall under the rubric of matters of public concern. The court stated that the questions were not of public import primarily because they did not seek to inform the public that the district attorney's office was not discharging its governmental responsibilities, nor attempt to bring to light actual or potential wrongdoing or breach of public trust on the part of the district attorney. Instead, the court noted, the focus of the communications was "to gather ammunition for another round of controversy with [the plaintiff's] superiors." Id. The court stated that
 [t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark and certainly every criticism or a public official — would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the first amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs. supra, 149.
Connick v. Meyers, supra, 149.
Contrast Rankin v. McPherson, supra, in which the plaintiff, a deputy constable with "purely clerical" responsibilities, remarked after an attempted assassination of then President Reagan "If they go for him again, I hope they get him." Id., 380. The court, considering the statement in context, found that it addressed matters of public concern, noting that the statement was made during a discussion of administration policies, and that it was the kind of statement traditionally afforded first amendment
protection. Id., 386.
It is apparent that the "matter of public concern" determination ultimately turns upon whether the speaker is exercising his or her rights as a citizen, or as an employee, expressing grievances with the circumstances of his or her employment. See Terrell v. University of Texas System Police, 792 F.2d 1360, 1362 (5th Cir. 1986), cert. CT Page 7299-W denied 479 U.S. 1064 (1987). Illustrative of this distinction is Callaway v. Hafeman, 832 F.2d 414 (7th Cir. 1987), a case in which an employee of a public school district alleged that she was fired because she complained to school district administrators that she was being sexually harassed by her supervisor. Id. The court held that "incidences of sexual harassment in a public school district are inherently matters of public concern," but ruled that
 [w]hile the content of [the plaintiff's] communications touched upon a matter of public concern generally, she was not attempting to speak out as a citizen concerned with problems facing the school district; instead, she spoke as an employee attempting to resolve her private dilemma.
Id., 417.
In order to determine whether the plaintiff's statements addressed a matter of public concern, the court must first identify the speech acts which, according to the plaintiff, led to her dismissal. Then, the court must determine whether each speech act or group of speech acts constituted "expression on a matter of public concern." Based on the findings of fact, the court concludes that the plaintiff's allegations of sexual impropriety constitute speech on a matter of public concern; the remaining speech by the plaintiff is "private" speech not addressed to the public by the plaintiff in her role as citizen.
b) The Balancing Test
Based on the determination that portions of the plaintiff's speech addressed a matter of public concern, the second step of the first amendment inquiry requires that the speaker's interest in making the statement be balanced against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." (Emphasis added) Rankin v. McPherson, supra, 388; Pickering v. Board of Education, supra, 568. In performing the balancing, the manner, place, and time of the employee's expression are relevant, as is CT Page 7299-X the context in which the dispute arose. Rankin v. McPherson, supra.
"[T]he state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the employee's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." Id., 388. Thus, in performing the second part of the Pickering balancing test, the Supreme Court has recognized as "pertinent considerations" whether the statement "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speakers duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, supra, 388, citing Pickering v. Board of Education, supra, 570-73.
The court must then weigh the importance of the speech, taking into consideration the time, place, manner of the speech; statements "on matters of public concern" made by the plaintiff as citizen, are entitled to much greater weight than those statements not on matters of public concern or those made by the plaintiff as employee. For example, an employee's charge of unlawful conduct may be given far greater weight in the balancing process than a complaint about internal office operations and relations. Vasbinder v. Ambach, supra, 1339. Compare Giaclone v. Abrams, 850 F.2d 79, 85-86 (2d Cir. 1988) (complaint about tax law interpretation carries little weight in the balancing process) with Rookard v. Health Hospitals Corp.,710 F.2d 41, 46 (2d Cir. 1983) (complaint of fraudulent and corrupt practices carries great weight).
Proceeding with the analysis, the court must next determine what speech is protected, and what is not protected. Based on the facts found, the court has concluded that, among the plaintiff's activities contained in the findings of fact, the plaintiff's allegations of sexual impropriety constitute speech enjoyingfirst amendment protection; the remaining speech is "private" speech, not addressed to the public by the plaintiff in her CT Page 7299-Y role as citizen and, therefore, outside the scope offirst amendment protection provided to government employees.
B. The "Substantial Factor" Test
Based on the determination that a portion of the plaintiff's speech comes within the protection of thefirst amendment, the court must next decide whether the plaintiff was discharged "on account of" her exercise of these protected rights.
Connecticut courts look to federal law for guidance in analyzing the propriety of an allegedly tortious employment decision. See Ford v. Blue Cross Blue Shield of Connecticut, 216 Conn. 40, 53, 578 A.2d 1054 (1990) (applying burden-shifting analysis of McDonnell Douglas Corporation v. Green,[2] 411 U.S. 792, 93 S.Ct. 1817,36 L.Ed.2d 668 (1973) in a state-law workers' compensation discrimination case); Chestnut Realty v. CHRO, 201 Conn. 350,358-362, 514 A.2d 749 (1986) (applying McDonnell Douglas test to housing discrimination claim brought under General Statutes 46a-64); Wroblewski v. Lexington Gardens, Inc.,188 Conn. 44, 53, 448 A.2d 801 (1982) (applying burden-shifting analysis to sex discrimination action) Pik-Kwik Stores, Inc. v. Commission on Human Rights Opportunities, 170 Conn. 327, 331, 365 A.2d 1210 (1976) (sex discrimination case applying burden-shifting standards). Where the plaintiff is a public employee who alleges that an adverse employment decision impermissibly interfered with the employee's first amendment rights, the federal courts apply the standard enunciated in Mt. Healthy, supra. Here, because an action under General Statutes 31-51q is similar to an alleged first amendment violation under 42 U.S.C. § 1983, the most appropriate approach is that contained in the Mt. Healthy case.
Under the Mt. Healthy causation analysis a plaintiff, upon showing that her conduct was constitutionally protected, must first show that the protected conduct was a "substantial factor" or a "motivating factor"[3] in the defendant's employment decision. Mt. Healthy Board of Education v. Doyle, supra, 287. Thus, here the court must determine whether the plaintiff's constitutionally protected speech was a substantial or motivating factor in the adverse CT Page 7299-Z employment decision. In this instance, the court will assume, without deciding, that the plaintiff has met her burden on this issue in view of the court's conclusion that the plaintiff's case fails on other grounds.
C. The Defendant's "Legitimate" Grounds for Dismissal
Assuming for purposes of this analysis that constitutionally protected conduct was a substantial or motivating factor in the public employer's employment decision, then, under the second part of the Mt. Healthy causation analysis, the defendant must show, by a preponderance of the evidence, that it would have reached the same decision as to the plaintiff's employment even in the absence of the protected conduct. Mt. Healthy Board of Education v. Doyle, supra, 287. The court then undertakes to examine all of the proffered reasons for the adverse employment decision, except those that come within the protections of the first amendment. If the defendant can show that the plaintiff would have been fired even if she had not exercised rights protected by the first amendment, then the defendant has met its burden under the Mt. Healthy test. The plaintiff would, therefore, have failed to prove that her termination was "on account or" protected speech under General Statutes 31-51q. On the basis of the findings of fact, the court concludes that, indeed, the plaintiff would have been fired notwithstanding her exercise of protected first amendment rights. Specifically, the plaintiff would have been fired in any event for the reasons recited in the termination letter, including: causing a patient to leave the hospital against medical advice, making accusations against staff without providing information so an investigation could be made, for the Shirley Randolph incident, for her behavior regarding her paychecks, for her behavior toward Oliveiri, for the failure to give information during the confidentiality episode and for upsetting other patients.
D. Interference With Employer-Employee Relations
Unlike other employment discrimination statutes, e.g., General Statutes 31-290a; 42 U.S.C. § 2000e, et seq., General Statutes 31-51q imposes an additional burden of showing that the employee's protected activity did not CT Page 7299-AA "substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer." General Statutes31-51q. Having decided that the plaintiff has not shown by a preponderance of the evidence that she was fired "on account of" her constitutionally protected activity, but on account of other, legitimate reasons, the court need not analyze the issue of whether the plaintiff's protected activity impaired her job performance of her working relations.
For the foregoing reasons, judgment may enter on all counts in favor of the defendants.
Schaller, J.