In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2703

JACKIE B. ALLEN,

Plaintiff-Appellant,

v.

FRANK MURIELLO, MARIE B. KRUSE, and
OAK PARK HOUSING AUTHORITY,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 97 C 3517--Blanche M. Manning, Judge.

ARGUED April 11, 2000--DECIDED JUNE 21, 2000

Before MANION, DIANE P. WOOD, and EVANS,
Circuit Judges.

EVANS, Circuit Judge.  Jackie Allen is
an innocent man. But in processing his
application for federal housing
assistance, the Oak Park Housing
Authority treated him otherwise. After
background checks revealed what the
Authority said was a disqualifying
criminal record, it suspended Allen's
application and discouraged him from
attempting to clear his name. Because
Allen believed this treatment sharply
contrasted with the way the Authority
handled white applicants who found
themselves in similar circumstances, he
sued under Title VIII of the Fair Housing
Act and Title VI of the Civil Rights Act
of 1964, alleging that the Authority
discriminated against him because he is a
black man. On the Authority's summary
judgment motion the district court
dismissed the case, finding that Allen
had not made out a prima facie showing of
discrimination. Allen now appeals the
dismissal of his Fair Housing Act claim.
In reviewing this grant, we take the
facts as Allen presents them but without,
of course, vouching for their accuracy.

Section 8 is a federal program designed
to assist the elderly, low income, and

disabled pay rent for privately owned housing. Applicants to the program who fit the necessary criteria but have been arrested for drug-related or violent crimes within 3 years of their application, or convicted of these crimes such that their probation or jail time extends to within 5 years of their application, are ineligible.

Allen is a veteran who was receiving treatment for severe depression when he applied to the Oak Park Housing Authority for Section 8 assistance in 1997. As part of its review of his application, Oak Park provided Allen's name, race, sex, and social security number to the local police and asked them to check whether Allen had a criminal record. The local police sent this information off to the Illinois State Police and, in response, received a teletype that referred to a "Larry W. Hamilton" who had, on two undisclosed occasions, been convicted of "smuggling." Hamilton's birth date did not match Allen's, but one of several social security numbers linked to Hamilton did, and the two were both black men.

Based on this information, the Authority assumed that Hamilton was Allen and thus sent Allen a letter stating that because the "criminal check . . . showed evidence of criminal offenses and several alias names/1 . . . we will not continue processing your [application]." The letter also stated that Allen could seek a review of the decision with Oak Park's executive director, but it did not provide Allen with any details about his alleged criminal record.

Since Allen had never gotten into any trouble with the law, he contacted the Authority and said that it had made a mistake. Marie Kruse, Oak Park's Section 8 program director, responded that Allen would need a lawyer to clear his name and then abruptly stopped the conversation. Scared that he would lose his housing assistance, Allen called back later. He got the same response.

Allen then took Oak Park up on its offer and requested a hearing with the executive director. He also asked for a copy of his "criminal report." The Authority scheduled a hearing but, without explanation, Kruse refused to

provide Allen with a copy of the report. In an affidavit, Kruse later disclosed a peculiar fact. She said she did not turn the report over--despite agency regulations that required her to do so--because the police officer who performed the background check told her that giving Allen a copy of the report would violate Larry Hamilton's privacy rights if the two were, indeed, different people.

In the month leading up to his hearing Allen began searching for people who might help him clear his name. After visits to the State's attorney's office, the public defender's office, the Cook County Housing Authority, the Oak Park police department, and the John Marshall Law School's legal clinic, Allen found a housing specialist with the United States Department of Housing and Urban Development (HUD) who agreed to call Kruse on his behalf. But this, too, proved useless. When the housing specialist asked Kruse if she was absolutely sure she had the right guy, he got the same response as Allen:  Kruse was sure, and Allen would need a lawyer to clear his name. Allen then contacted Merilyn Brown, an attorney in HUD's Department of Fair Housing and Equal Opportunity. Brown agreed to attend the hearing on Allen's behalf.

At the hearing, Allen once again explained that he did not have a criminal record. He then complained about the difficulty he had faced trying to clear his name when the Authority refused to provide him with a copy of his alleged record. Finally, he asked why Kruse treated him so poorly, stating "I'm a veteran. I fought for this country. I believe in this country, and you treat me as if I'm nothing." In response, according to Brown's recollection of the hearing,

[Kruse] blew him off. . . . She did not respond to him. She threw her head. It was kind of ugly. . . . I gave a speech. I had to because they were not helping this man. They were not trying to be sympathetic to this man. . . . I tried to explain to [Kruse], you know, that common courtesy doesn't cost anybody anything . . . . And I asked her, "Would you at least be willing apologize to him for the treatment he has received?" She told me no.

Frank Muriello, Oak Park's executive director, then showed Allen a copy of the one-half- page "criminal record" that the Authority was banking on to deny Allen's application. Kruse explained that unless Allen could produce information then and there that he had not committed the crimes referred to in the teletype, the Authority's position on his application would become final. Brown and Allen objected and Muriello eventually relented, saying that if Allen could provide fingerprints proving that he was not Larry Hamilton, the decision would be reversed.

Once Allen was fingerprinted, cleared, and allowed to transfer his Section 8 housing to Oak Park, he filed this suit against the Authority as well as Kruse and Muriello. To flesh out his claims, Allen related the stories of Tom Arado and Mary Jenkins, two white Section 8 applicants whose background checks also uncovered possible past criminal conduct. Arado, like Allen, received a letter rejecting his 1996 Section 8 application after the police reported to the Authority that he had been sentenced to 8 years in prison for drug-related offenses in 1987. Arado contested the determination and, like Allen, was permitted to make his case at a hearing attended by Kruse and Muriello. Arado admitted to his conviction at the hearing, but stated that he had finished serving his time and probation for the offense in 1990. Kruse and Muriello took him at his word and reinstated his application since, according to Arado, neither his jail time nor his probation extended into the time frame that would have disqualified his application.

The Authority's background check of Jenkins produced a report showing arrests and convictions for several weapons, assault, and drug charges. In response, Kruse asked Jenkins to come down to the office, where the two held an informal meeting. Kruse showed Jenkins the report, and when Jenkins asserted that it was not hers, Kruse explained that she should clear her name by going to the local police station. Jenkins followed Kruse's advice, was fingerprinted, cleared, and her application proceeded without a hitch.

The district court granted summary judgment after determining that Allen could not make out a prima facie discrimination claim under the McDonnell Douglas burden-shifting test. See Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1529 (7th Cir. 1990) (holding that the mental element required to make out a disparate treatment claim under Title VIII of the Fair Housing Act is the same as that required under Title VII of the Civil Rights Act of 1964); see also Kormoczy v. Secretary, United States Dep't of Housing and Urban Dev. ex rel. Briggs, 53 F.3d 821, 824 (7th Cir. 1995) (noting that plaintiffs may use the McDonnell Douglas framework to make out claims under Title VIII of the Fair Housing Act). The court explained that since Arado never contested his conviction, the fingerprint requirement was moot, and thus he and Allen were not sufficiently similarly situated to make their disparate treatment actionable. The court then found that since both Jenkins and Allen were eventually required to submit fingerprints to clear their names, the two were not disparately treated./2

Allen asserts that by framing the case as focusing solely on fingerprinting, the district court skipped over his central complaint--that when he and the white applicants all faced positive background checks, the Authority solicitously made every effort to ensure that the white folks' applications would not be derailed, while it discouraged him from continuing with the process. He believes that this constitutes disparate treatment of similarly situated applicants, and thus that he more than adequately made out a prima facie case of discrimination under Title VIII of the Fair Housing Act./3

We begin by assessing the district court's conclusion that Allen could not make out a prima facie case because he and Arado were not similarly situated. As stated, this finding placed great weight on the fact that Oak Park did not require Arado's fingerprints because he admitted to his prior conviction. If Allen's sole complaint was that he had been fingerprinted while Arado had not, Arado's admission would be relevant. But fingerprinting is not the essence of Allen's claim--it is evidence toward it. Allen's beef lies in the fact that he was

required to submit proof to support his eligibility, while Arado was taken at his word. Arado's admission does not explain this distinction.

The Authority, however, attempts an explanation. It argues that the "failure to take Allen's word as against the official police report can in no way be equated with OPHA's willingness to take Arado's word for the actual period of incarceration and no probation when there was no evidence to the contrary." The Authority believes that Allen's word would have had to overcome a "disqualifying criminal background which was rebutted only by Allen's unsupported assertion that it was not his," whereas Arado's word merely "explain[ed] an ambiguity." In other words, the two situations are not analogous because Arado's criminal report did not contain a disqualifying event, whereas Allen's did.

This ignores the facts. Allen's "record" in the name of Hamilton in no way disqualified him on its face. In fact, it did not state when he had allegedly been convicted, nor did it detail whether his alleged conviction would bring him within the range of disqualifying crimes. Arado's drug convictions, on the other hand, would certainly have disqualified him if he had served even half of his sentence. Thus, if anything, from the face of the criminal reports Allen looked like he'd be the more likely of the two to avoid disqualification. Despite this, Allen was put to his proofs and Arado was given a free pass. This is disparate treatment. And, the two men were almost identically situated: both had applications suspended because they were suspected of having committed disqualifying crimes; both appealed and were given a hearing attended by Muriello and Kruse; and both then asserted facts about their pasts that would have allowed their applications to be reinstated. Arado's was; Allen's was not.

While Allen certainly has not carried his ultimate burden of showing that racial animus drove the Authority's conduct, he has alleged a prima facie case under Title VIII of the Fair Housing Act. See Village of Bellwood, 895 F.2d at 1529 (holding that any effort to discourage people from attaining housing because of their race violates Title

VIII). Further, Oak Park's rather dubious explanation for the differing treatment-- that Arado's application contained a mere "ambiguity" while Allen's contained a "disqualifying event"--puts the issue of pretext in the lap of a trier of fact.

Standing alone, Oak Park's differing treatment of Allen and Arado offers a sufficient basis to reverse the district court's decision. But we need not stop here, as reviewing the court's conclusion that Allen and Jenkins were not disparately treated leads to the same result.

The district court correctly observed that Allen and Jenkins both eventually had to be fingerprinted. But this does not explain the different ways their cases were handled. While both applicants submitted fingerprints to dispel the shadow a false criminal report cast over their applications, this similar ending does not mean that the two did not face materially different treatment along the way.

In fact, they did. When the Authority received a potentially disqualifying criminal report for Jenkins, it did not tell her that she could only clear her name with a lawyer, it did not refuse to show her her alleged record, it did not make her attend a hearing and threaten to cut off her funding, and it did not wait until a HUD lawyer took up the fight before disclosing to her that fingerprinting would take care of the situation. Instead, Oak Park invited Jenkins to a meeting, explained the problem, and, when Jenkins asserted her innocence, told her how to clear her name. Once again, this constitutes disparate treatment.

Oak Park acknowledges that it treated Allen and Jenkins differently but asserts that this stemmed from a policy change, not discrimination. The Authority explains that because its treatment of Allen led to problems, it came up with a less confrontational way to handle applicants whose background checks revealed ambiguous criminal records. Since this new, nondiscriminatory policy accounts for the different treatment of Jenkins, the Authority urges us to affirm the district court.

Allen, however, raises at least a couple of reasons that, again viewing the evidence and inferences in his favor, cast doubt on the Authority's explanation. First, he notes that despite its detailed regulations, the Authority can point to nothing that documents its alleged policy shift. Next, he directs us to Muriello's statement that the handling of Jenkins' claim "is the usual thing" and that as far as Muriello knew, Allen wasn't treated any differently. Allen suggests if there was indeed a formal policy change in response to his case, it stands to reason that Muriello would be aware of the change.

None of this proves Oak Park is lying. Indeed, the Authority may very well be able to convince a jury that a changed policy best explains why it handled Allen's and Jenkins' applications so differently. But Allen casts sufficient doubt on the Authority's explanation to avoid summary judgment. Whether Oak Park did indeed create a new policy or whether it came up with the new policy after the fact to explain its different treatment is a contested factual issue which should be decided by a jury.

The Authority's processing of Allen's application differed sharply from its handling of the nearly identically situated Arado and Jenkins. This could very well be a case of bureaucratic bungling, but were it discrimination, it would likely look much the same. For this reason, the law allows plaintiffs alleging discrimination to make their case circumstantially. And on summary judgment, the McDonnell Douglas test's shifting burdens of proof attempt to ensure that a case of actual discrimination does not slip through the cracks for lack of direct evidence. If the test is to work--and our antidiscrimination laws are to have an effect on more than the most egregious and obvious discrimination--courts should neither narrow McDonnell Douglas's application such that no one is similarly situated, nor broaden its application such that no one is disparately treated.

Jackie Allen's allegations that his application for federal housing assistance was handled differently than those of two similarly situated white applicants presents a prima facie case

that he was discriminated against because he is black. Since Oak Park's explanations for its conduct raise triable issues of fact, the case should not have been dismissed on summary judgment. The judgment is REVERSED and the case REMANDED for further proceedings.

FOOTNOTES

/1 The "several alias names" were Larry W. Hamilton and Larry William Hamilton.

/2 The text of the district court's opinion actually states that Allen and Jenkins were not similarly situated because "it is wholly irrelevant that Kruse did not tell [Jenkins]--as she did Allen-- that fingerprints were mandatory since Jenkins clearly inferred such." But since this statement explains that Allen and Jenkins received the same treatment, it appears the court may have made a small slip of the pen. We thus infer that the court meant that the similar treatment the two received showed that Allen was not disparately treated.

/3 Allen opted to drop his claims under Title VI without explanation.