[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an administrative appeal by the plaintiffs, Ricky and Regina Cooper, from a final decision of a hearing officer of the Commission on Human Rights and Opportunities ("CHRO"), dismissing the plaintiffs' affidavit of illegal discrimination ("complaint") against Andrew and Hanna Gorski, alleging housing discrimination because of the plaintiffs' race (black).[1] The plaintiffs' appeal is authorized by General Statutes §§ 46a-94a and 4-183 of the Uniform Administrative Procedure Act ("UAPA"). For the reasons set forth below, the court finds the issues in favor of the plaintiffs.
The record on appeal shows as follows. The Gorskis, who are white, own a four-family apartment house located on Trinity Street in New Britain, Connecticut. (Return of Record ("ROR"), Item 2, p. 32.) As the apartment units became available, they were rented by Gorskis through word of mouth, neighbors and friends. The Gorskis did not have a consistent CT Page 12928 rental procedure and did not consistently apply any statistically appropriate standards or criteria to objectively evaluate an applicant for tenancy. (ROR, Item 1, Background, ¶ 1.)
The Gorskis evicted a tenant from one of the apartment units due to non-payment of rent, which resulted in financial loss to the Gorskis. As a result, the Gorskis decided to use a rental management service, RE/MAX, for advertising and screening prospective tenants for the now-vacant apartment. The Gorskis hired Kathy Veneziano, a licensed real estate agent with RE/MAX, and executed an "exclusive right rental agreement". The Gorskis did not advise Veneziano as to any criterion, financial or otherwise, they expected in a tenant but expected Veneziano to provided and prepare forms, verify information, screen the applicants and introduce those applicants that were qualified. The Gorskis retained the ultimate decision-making authority to rent. (ROR, Item 1, Background, ¶ 3.)
In September of 1996, the Coopers responded to a RE/MAX rental advertisement in the New Britain Herald, which listed three apartment units including the Gorskis' apartment. (ROR, Item 2, pp. 31, 137.) Veneziano provided the Coopers with a rental application form used for all prospective tenants. The application form required a credit check of all applicants and imposes a $20.00 application fee for costs of the credit check. The application also contains the following provision: "I understand that the information I have presented on this Application may be check and investigated. I also understand that I cannot take possession of the premises until a lease is signed and the first month's rent and security is paid." The application was filled in by the Coopers without any fee or deposit. On the application, the Coopers provided most of the requested information, such as the number of people to occupy the apartment, a landlord reference, and some employment information. (ROR, Item 2, pp. 36, 146, 148.)
After investigating Mrs. Cooper's employment history, Veneziano ran a credit check on the Coopers and verified their landlord reference. She determined that the Coopers were eligible to rent the Gorskis' apartment and contacted Mr. Gorski on September 9, 1996. (ROR, Item 2, pp. 149-50, 152.) Mr. Gorski agreed to meet with the Coopers on September 10, 1996. (ROR, Item 2, p. 152.) The Gorskis believed that the meeting was to enable the parties to review the application and draft lease that Veneziano had prepared and determine whether any additional information would be required. According to Veneziano, the lease agreement could not be executed at the meeting because the Coopers did not have the first month's rent or security deposit available as required by the lease.
The Coopers, however, believed that based on Veneziano's representation CT Page 12929 that the Coopers were qualified, they had been accepted as tenants. The Coopers expected that the meeting was to "iron out a few details and getting acquainted." Accordingly, both parties had different expectations as to the purpose of the September 10, 1999 meeting. (ROR, Item 1, Background, ¶¶ 9, 10.)
The meeting commenced cordially but degenerated quickly. Initially, only Mrs. believed was not involving her in the discussions with the Coopers or reviewing the Coopers' credit report with her. (ROR, Item 3, p. 301.) Mrs. Gorski noticed that the rental application was incomplete and did not contain Mr. Cooper's work history and that Mrs. Cooper had only worked at her current position for ten months. (ROR, Item 3, p. 246.) Mrs. Gorski questioned the Coopers about their work experience, including asking Coopers, Mrs. Gorski questioned them belligerently (ROR, Item 2, pp. 43, 96, 196; Item 3, p. 324); although Mrs. Gorski denies any intent other than to find out more information. (ROR, Item 3, p. 306.) At this time, Mr. Gorski arrived at the apartment and after discussing the matter with his wife, told Veneziano that more information was needed from the Coopers before a lease would be considered. (ROR, Item 2, pp. 166, 167, 247.) Mr. Gorski asked Veneziano to verify that Mr. Cooper was attending school, other income he had available, his prior work experience and Mrs. Cooper's employment prior to present employer. (ROR, Item 2, pp. 166, 167.)
Later that night, Mr. Cooper called Veneziano and told her that he believed that the Gorskis' conduct was motivated by racial bias. (ROR, Item 2, p. 119.) The Coopers decided that they would not be comfortable renting from the Gorskis and decided to take another apartment on Corbin Avenue. (ROR, Item 2, p. 131.) The Coopers advised Veneziano to withdraw their rental application with the Gorskis.
Meanwhile, the Gorskis decided that Veneziano was not providing adequate assistance to them, discharged her and commenced their usual "informal" rental procedure. (ROR, Item 3, pp. 253, 280.) Utilizing this method, the Gorskis rented the apartment to a white male. (ROR, Item 3, pp. 255, 259.) The Gorskis did not know whether this tenant was working, whether he was employed, did not ask for any employment history, did not verify his income, did not check his landlord reference, and did not perform a credit check. (ROR, Item 3, pp. 254-55, 281-85.) They also did not request a security deposit as they had from the Coopers. (ROR, item 3, pp. 285, 287, 320, 329.)[2]
Subsequently, on October 11, 1996, the Coopers filed a complaint with the CHRO alleging that the Gorskis discriminated against them based on their race in violation of HUD regulations, the federal Fair Housing Act and the Connecticut Fair Housing Act. The Coopers claimed that the CT Page 12930 Gorskis subjected them to different application and rental requirements because of their race, and second, that by the tenor of the September 10, 1996 meeting, the Gorskis had constructively denied the Coopers the apartment unit.
The complaint was investigated by the CHRO and certified to a public hearing on October 1, 1997. (ROR, Item 17.) On May 14, 1999, the hearing officer issued his decision, dismissing the Coopers' complaint. (ROR, Item 1.) With respect to the differing standards claim, the hearing officer concluded the Coopers' attempted rental had taken place with the assistance of a real estate agent so that a prima facie case of discrimination had not been made. According to the hearing officer, the real estate agent isolated the Coopers' transaction with the Gorskis from any other of the Gorskis' rental practices. (ROR, Item 1, p. 7.) Second, the hearing officer concluded that the concept of constructive denial" did not appear in housing discrimination law and did not apply that doctrine to the facts of this case.
Thereafter, on June 16, 1999, the plaintiff timely appealed to this court claiming that the hearing officer: (1) relied upon evidence that was not in the record; (2) excluded highly probative evidence of the Gorskis' intentional discrimination against the Coopers; (3) acted arbitrarily and capriciously in concluding that the Gorskis' use of a realtor when dealing with the Coopers explained the differences in treatment between the Coopers and white applicants; and, (4) wrongly concluded that the doctrine of constructive denial did not apply in housing discrimination cases.[3]
The court's "review of an agency's factual determination is constrained by General Statutes § 4-183 (j), which mandates that a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. . . . This limited standard of review dictates that, with regard to questions of fact, it is neither the function of the trial court . . . to retry the case or to substitute its judgment for that of the administrative agency. . . . An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The CT Page 12931 burden is on the plaintiffs to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record. . . ." (Brackets omitted; citations omitted; internal quotation marks omitted.) New England Cable Television Assn., Inc. v.DPUC, 247 Conn. 95, 117-18 (1998). On the other hand, "it is for the courts, and not for administrative agencies to expound and apply governing principles of law." Connecticut Humane Society v. FOIC,218 Conn. 757, 762 (1991).
The plaintiffs' two initial grounds of error are that the hearing officer made use of out of record evidence and improperly excluded evidence of prior bias on the part of the Gorskis. As indicated above, issues such as this are within the discretion of the hearing officer. SeeGriffin v. Muzio, 10 Conn. App. 90, 93. cert. denied, 203 Conn. 805
(1987): "The erroneous admission of evidence will not invalidate an administrative order unless substantial prejudice is affirmatively shown. . . ." The court does not find that the substantial rights of the plaintiffs have been prejudice. The hearing officer referenced a black roommate in the background portion of his decision and did not rely on this fact in reaching his conclusion to dismiss the plaintiffs' complaint. (See ROR, Item 2, p. 3, ¶ 1.) As to the issue regarding excluding evidence of bias, the transcript indicates that the hearing officer did not prohibit the testimony of Mrs. Baines, but rather chose not to credit her testimony. (ROR, Item 3, p. 374.)
The plaintiffs urge the court to find error in the hearing officer's treatment of Coopers' constructive denial claim.[4] On this point, the court agrees with the hearing officer. The housing laws do not allow a claim of "constructive denial." There is, however, the doctrine of "futile gesture," which is a similar concept. The leading case for "futile gesture" is Pinchback v. Armistead Homes Corp., 907 F.2d 1447, cert. denied, 488 U.S. 983, 112 L.E.2d 527, 111 S.Ct. 515 (1990), which sets forth the requisite showing as follows: "The plaintiff must be a member of a racial minority who was a potential bona fide buyer of the property and financially able to purchase it at the time it was offered for sale; the owner discriminated against people of the plaintiffs race; the plaintiff was reliably informed of this policy of discrimination and would have taken steps to buy but for the discrimination; and the owner would have discriminated against the plaintiff had the plaintiff disclosed an interest in the property." Id., 1452.
The plaintiffs do not satisfy the requirements of the "futile gesture doctrine." The record does not indicate that the plaintiffs were aware on September 10, 1996, of a "well-known, discriminatory policy" by the Gorskis against African Americans. Darby v. Heather Ridge,806 F. Sup. 170, 174 (E.D.Mich. 1992). Nor have the plaintiffs CT Page 12932 demonstrated that after further verification of the Coopers' rental qualifications that the Gorskis would not have rented to the Coopers. Therefore, the futility requirement has not been satisfied. Fox v.Baltimore City Police Department, 201 F.3d 526, 535 (2000).
The court agrees with the plaintiffs, however, that the hearing officer did not properly apply the law regarding whether differing rental requirements were used for blacks and whites, which formed the first portion of the plaintiffs' complaint. The federal Fair Housing Act, and regulations issued thereunder, as well as the state statutes, make it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling on the basis of race, color, religion, sex, familial status, national origin or handicap.42 U.S.C. § 3604; 24 C.F.R. § 100.60 (b)(4); General Statutes § 46a-64c(2). The parties were required to proceed to CHRO hearing pursuant to a disparate treatment test set forth in McDonnell DouglasCorporation v. Green, 411 U.S. 792 (1993). See also Chestnut Realty,Inc. v. CHRO, 201 Conn. 350, 361 (1986). "The importance of McDonnellDouglas lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion. . . . This reasoning is equally applicable to cases involving housing discrimination. . . ." (Citations omitted; internal quotation marks omitted). Id.
Thus, the plaintiffs have the burden to establish a prima facie case of discrimination to which the Gorskis reply if the plaintiffs establish their case. The prima facie case applicable here required the plaintiffs to show that they were members of a protected class and that they were treated differently than similarly situated whites with respect to applications and rental requirements.[5] United States v. YouritanConstruction Co., 370 F. Sup. 643, 648 (N.D.Cal. 1973); (prohibiting arbitrary and uncontrolled applicant rental procedure); aff'd and remanded in part, 509 F.2d 623 (9th Cir. 1975); Allen v. Muriello,217 F.3d 517, 522 (7th Cir. 2000) ("application for federal housing assistance was handled differently than those of two similarly situated white applicants").
The hearing officer applied the law incorrectly to the facts of record, O'Callaghan v. Commissioner of Social Services, 53 Conn. App. 191,203 (1999), as he apparently concluded that the Coopers had failed to satisfy a prima facie case on the application process. The plaintiffs are unquestionably protected class members. The previous tenant and the subsequent tenant did not have to meet the rigorous standards imposed by the Gorskis in the application process. The fact that a realtor was CT Page 12933 supplying information to the Gorskis for their evaluation of the Coopers is not sufficiently material. In every instance of the renting the property, the Gorskis personally decided on the merits of the prospective tenant and the information needed from each prospective tenant.
As found by the hearing officer, the Gorskis retained the right to refuse any tenant. (ROR, Item #1, Background, ¶ 3.) The hearing officer incorrectly dismissed the Coopers' complaint as lacking a primafacie case involving disparate treatment, with the conclusions that, based on singling out the Coopers, "there were no different application requirements" or no similar white applicants. (ROR, Item #1, p. 7.) The proper analysis on whether the Coopers established a prima facie case was not made. Again the prima facie case is established only by showing two items — a protected class and varying application requirements. Why the Gorskis changed their approach to the Coopers, as opposed to other tenants, is not part of the Coopers' initial burden.
In accordance with Connecticut General Statutes § 4-183 (k), the case is remanded to the CHRO. The CHRO is ordered to vacate the decision dismissing the Coopers' complaint, and render a new decision based on that record, and consistent with this decision. See CHRO v. MetropolitanDistrict Commission, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. CV 94 0538066 (Maloney, J., July 30, 1995.)
Henry S. Cohn, Judge